PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-4719
_____

RICARDO PIESCHACON-VILLEGAS,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent
_____

ON PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS
(BIA No. A079 191 076)
Immigration Judge: Honorable Andrew Arthur
_____

Argued February 8, 2011
_____

Before: JORDAN, GREENAWAY, JR., and STAPLETON,
*Circuit Judges*.

(Opinion Filed: December 5, 2011)
_____

1

Albania C. Almanzar (argued)
177 East 161st Street
Bronx, NY 10451
          *Counsel for Petitioner*

David V. Bernal
Jesse M. Bless (argued)
Aaron R. Petty
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
          *Counsel for Respondent*

_____

OPINION
_____

GREENAWAY, JR., *Circuit Judge*.

Ricardo Pieschacon-Villegas ("Pieschacon-Villegas") petitions for review of a decision of the Board of Immigration Appeals ("BIA" or "Board") dismissing his appeal of the Immigration Judge's ("IJ") denial of his request for deferral of removal under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). Pieschacon-Villegas seeks this Court's review because he asserts that: (1) the BIA used an incorrect legal standard for determining whether torture would be inflicted with the acquiescence of the Colombian government

and (2) the BIA failed to take into account evidence in the record demonstrating that, if Pieschacon-Villegas is removed to Colombia, he will more likely than not be tortured with the acquiescence of a public official. We will grant the petition and remand to the BIA.

## I. **BACKGROUND**

Pieschacon-Villegas was born in 1969 and is a Colombian native and citizen. He has entered and left the United States on a number of occasions. Pieschacon-Villegas last entered the United States as a special parolee in December 2007. One of Pieschacon-Villegas's siblings lives in the United States and his other siblings and his parents live in Colombia.

From 1996 until 2003, Pieschacon-Villegas received fees for laundering Colombian drug traffickers' money. In 1999, Federal Bureau of Investigation ("FBI") agents in New Jersey learned about Pieschacon-Villegas's involvement in money laundering during an undercover investigation. The FBI was aware that Pieschacon-Villegas was involved in a transaction with a major drug operation in 1999, in which he made wire transfers totaling $218,467. He was subsequently arrested and indicted for his involvement in that money laundering scheme.

On August 21, 2003, Pieschacon-Villegas pled guilty to conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), for those 1999 transfers. He agreed to cooperate with the FBI and he was released on an unsecured bond. His conviction and sentencing were deferred.

3

Pieschacon-Villegas cooperated with the FBI from 2003 to 2007. During this time period, the FBI paid him $4,000 per month for the expenses he incurred during his cooperation. (App. at 461.) As a cooperator, Pieschacon-Villegas bought drugs and delivered money to help the FBI build cases against drug traffickers. The targeted drug traffickers worked for, or were associated with, the Autodefensas Unidas de Colombia ("AUC"), a paramilitary group. Pieschacon-Villegas worked from Colombia and would come to the United States to carry out transactions. The Colombian Department of Administration Security ("DAS") was aware that Pieschacon-Villegas was collaborating with the FBI.

In 2007, Pieschacon-Villegas was arrested upon returning to Colombia from the United States for failure to pay a fine a number of years earlier. Pieschacon-Villegas paid the fine, but remained in jail for twenty-two days.

This incident in jail provides the critical backdrop for Pieschacon-Villegas's petition for review. He posited that his arrest and jailing were to facilitate his murder by the AUC. Pieschacon-Villegas testified[1] that Colombian jails are managed by the AUC and the Fuerzas Armadas Revolucionarias de Colombia – Ejercito del Pueblo ("FARC"), another paramilitary group, and that the DAS informed AUC members of his incarceration so he would be harmed or killed.

---

[1] This refers to Pieschacon-Villegas's testimony on July 30, 2009 during the removal proceedings before the IJ. The IJ found Pieschacon-Villegas's testimony to be credible and the BIA did not disturb that finding.

4

On the day Pieschacon-Villegas was to be released from jail, he was led to a room to meet with his attorney. However, Pieschacon-Villegas's attorney was not in the room when Pieschacon-Villegas arrived there. Instead, Pieschacon-Villegas saw a man whom he did not recognize, so Pieschacon-Villegas left the room, went back to his cell, and called an associate who had also cooperated with the FBI. His associate brought an armored car to pick Pieschacon-Villegas up from jail. Pieschacon-Villegas asserted in his asylum application and during his testimony that when he tried to leave prison that day he saw people whom he had dealt with in the AUC waiting outside in vehicles. Pieschacon-Villegas testified that he thought these men were there to kill him, so he went back inside the jail and a prison official allowed the armored car into the prison to pick him up. Police officers who arrived on the scene said that the armored car had been involved in a crime. Pieschacon-Villegas testified that the allegation that the armored car had been involved in a crime was a ploy to ensure that police officers would kill him during a pursuit or provide false justification for his murder if he had left jail in that car.

Pieschacon-Villegas's actual attorney then called the military leader of the city and municipality, Baranquilla, in which the jail is located. The military leader sent a police escort to take Pieschacon-Villegas to the police station and dismissed the charge regarding the armored car being involved in a crime.

During the time Pieschacon-Villegas was in jail, the FBI arrested and extradited four alleged drug traffickers, including Miguel Amezquita ("Amezquita"), who had worked

5

with Pieschacon-Villegas in the money laundering business.[2] Pieschacon-Villegas also contends that when the four men were arrested they all knew of his collaboration with the FBI. According to Pieschacon-Villegas, Amezquita accused him of cooperating with the FBI and wrote a letter to other money launderers saying that he was a "rat" and that he would be killed. IJ Removal Proceedings Decision at 13 (July 30, 2009).

The record of the removal proceedings also includes sworn declarations from Nelson Malpica Rodriguez ("Rodriguez") and Pieschacon-Villegas's wife and his mother. Each of them swore that numerous notes threatening the lives of Pieschacon-Villegas and his family had been delivered to Pieschacon-Villegas's mother's building.[3] Pieschacon-Villegas produced for the record the asylum application his wife submitted, in which she states that FBI

---

[2] Pieschacon-Villegas asserts that the FBI had obtained an arrest warrant for a fifth man, but that warrant was not executed.

[3] Copies of a number of these notes were also included in the record. Translations of the notes include the following statements: "RICARDO PIESCHACON MRS AND CHILDREN MAY YOU REST IN PEACE," (App. at 206); "many . . . will be waiting your arrival again. You fucked us but worse off will be you and your people," (Id. at 210); "All the money in the world won't be enough to hide your woman, your children, brothers and mother. Poor 'Cuchita,' with a son so gonnorhea [slang for vile or horrible] and on top of that, a frog [slang for rat]," (Id. at 212 (alterations in original)). One of the letters was signed, "YOUR EX-FRIENDS." (Id. at 208.)

agents suggested that, if she valued her life and the life of her children, she should not go back to Colombia because of these threats.

On December 27, 2007, Pieschacon-Villegas traveled to the United States and was arrested on a bail revocation charge because FBI agents believed Pieschacon-Villegas was involved in money laundering outside of the parameters of his FBI cooperation. On June 11, 2008, Pieschacon-Villegas pled guilty to money laundering based on the 1999 transfers referenced his 2003 plea agreement. He was sentenced to thirty months of incarceration.

On November 18, 2008, the Department of Homeland Security ("DHS") served Pieschacon-Villegas with a Notice to Appear, charging him with being removable from the United States because: (1) he was an alien who had been convicted of acts which constituted a crime involving moral turpitude, see Immigration and Nationality Act ("INA") § 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(i)(I); (2) he was an alien who the Attorney General knows, or has reason to believe, has engaged in money laundering, as described in 18 U.S.C. §§ 1956 and 1957, INA § 212(a)(2)(I)(i), 8 U.S.C. § 1182(a)(2)(I)(i); and (3) he was an applicant for admission to the United States who did not possess a valid entry document, see INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I).

On February 18, 2009, Pieschacon-Villegas appeared before the IJ and conceded removability. On or about April 10, 2009, Pieschacon-Villegas submitted an application for deferral of removal under the CAT.

## A.    IJ Decision

In addition to Pieschacon-Villegas's testimony before the IJ regarding prior threats and alleged attempts to harm him, he testified that he would be killed by members of the AUC or the FARC if he returned to Colombia.

On July 30, 2009, the IJ issued a decision denying Pieschacon-Villegas deferral of removal. The IJ described Pieschacon-Villegas's testimony and other exhibits and reports submitted by both parties on Colombian country conditions. The IJ noted exhibits stating that, although the Colombian government has attempted to demobilize paramilitary groups and has claimed that all such organizations have been demobilized, a number of the groups (AUC and FARC) are still active, despite the illegality of membership.

The record before the IJ also included information indicating that a number of government officials were being investigated for alleged links to paramilitary groups. Further, twenty-seven army officers, including three generals, four colonels, and the head of the army had been fired or forced to resign due to civil rights violations. Additionally, nineteen military personnel had been charged with murder, forced disappearance, or false testimony.

The Colombian government had acknowledged that security forces had been responsible for extrajudicial executions in Soacha. The military often claimed jurisdiction over these cases but would close the cases without serious investigation. As a result, Colombian President Álvaro Uribe stated that the Soacha killings would be investigated by civilian courts.

The IJ noted that it was "clear that the government of Colombia is struggling with corruption" and "officials sometimes engaged in corrupt practices with impunity." IJ Removal Proceedings Decision at 19 (July 30, 2009). Some members of government security forces may have directly participated in paramilitary atrocities. The IJ continued that "any actions taken by government officials in Colombia in support of paramilitary groups are in contradiction to government policy." Id. at 20.

The IJ found that Pieschacon-Villegas testified credibly regarding his cooperation with the FBI and working with individuals associated with the AUC. The IJ also believed Pieschacon-Villegas's assessment that his cooperation would endanger his life if he returned to Colombia.

The IJ noted that he did not understand why Pieschacon-Villegas alleged that he would be harmed by the FARC[4] and found that any harm inflicted by the FARC would not be inflicted by, or at the instigation of, or with the consent or acquiescence of, the Colombian government. The IJ found that any harm inflicted on Pieschacon-Villegas by the AUC would be "'extrajudicial acts of brutality' by 'isolated rogue agents . . . [committed] not only in contravention of [Colombia's] laws and policies . . . but committed despite authorities [sic] best efforts to root out such misconduct', and therefore, not torture as that term is defined." Id. at 22–23 (citing In re Y-L-, A-G- and R-S-R-, 23 I. & N. Dec. 270, 283 (BIA 2002)).

---

[4] Pieschacon-Villegas did not work with anyone who was associated with the FARC.

Because Pieschacon-Villegas was not harmed when he was in the Barranquilla prison and the police helped to protect him, the IJ found that Pieschacon-Villegas failed to carry his burden for deferral of removal.

Pieschacon-Villegas appealed the IJ's decision to the BIA.

### B.     BIA Decision

On December 3, 2009, the BIA issued its decision dismissing Pieschacon-Villegas's appeal.  Without citing any sources, the BIA noted that "[CAT] protection does not extend to persons who fear entities that a government is unable to control.    To demonstrate acquiescence, the respondent must do more than show that the officials are simply aware of the activity constituting torture yet are powerless to stop it."  In re Pieschacon-Villegas, A049 191 076, at 2 (BIA Dec. 3, 2009).   The BIA referenced the country reports submitted to the IJ.  The BIA agreed with the IJ's decision to deny deferral of removal because "the record reflects that the Colombian government actively opposes the organizations that the respondent fears.  Thus, we reject the respondent's argument on appeal that the Colombian government would acquiesce to his torture under a willful blindness theory."  Id. (internal citation omitted).  The BIA also noted that Pieschacon-Villegas failed to show a clear probability that he would be tortured while in the custody or control of the offender.  The BIA continued that

> the existence of a consistent pattern of gross, flagrant, or mass violations of human rights in a particular country does not, as

such, constitute sufficient grounds for determining that a particular person would be in danger of being subject to torture upon his return to that country. Specific grounds must exist that indicate the respondent would be personally at risk.

Id. (internal citation omitted).

Pieschacon-Villegas petitions for our review.[5]

---

[5] Pieschacon-Villegas originally requested a Stay of Removal pending appeal which was granted. On March 28, 2011, Pieschacon-Villegas's counsel filed a motion to lift the Stay of Removal and indicated that Pieschacon-Villegas would await the results of the petition for review from abroad. In May 2011, after oral argument, we granted the motion to lift the Stay of Removal and, on May 23, 2011, Pieschacon-Villegas was removed to Colombia. Pieschacon-Villegas's removal does not moot his petition for review "[b]ecause a final order of removal creates 'sufficient collateral consequences.'" Gomez-Zuluaga v. Att'y Gen., 527 F.3d 330, 339 n.4 (3d Cir. 2008) (citing Amanfi v. Ashcroft, 328 F.3d 719, 724-25 n.1 (3d Cir. 2003)). "[S]ufficient collateral consequences" flow from a BIA order of removal to make an appeal a live case or controversy under Article III because an order of removal prevents the removed person from entering the United States for a period of years. Moi Chong v. District Director, I.N.S., 264 F.3d 378, 384-85 (3d Cir. 2001).

## II. JURISDICTION and STANDARD OF REVIEW

This Court has jurisdiction to review final orders of removal issued by the BIA, pursuant to 8 U.S.C. § 1252(a). The government contends that petitioner's challenge amounts to a disagreement with the BIA's determination that he failed to sufficiently demonstrate that public officials in Colombia would likely acquiesce in his torture. This Court would lack jurisdiction to consider such a challenge. 8 U.S.C. § 1252(a)(2)(C)-(D). This Court does, however, have jurisdiction over "constitutional claims or questions of law."[6]

---

[6] Determining "what is likely to happen to the petitioner if removed" is a factual inquiry outside the scope of our review, but determining whether "what is likely to happen amount[s] to the legal definition of torture" is a legal question. Kaplun v. Att'y Gen., 602 F.3d 260, 271 (3d Cir. 2010).

In Kaplun, we noted that

> Torture is a term of art, and whether imprisonment, beating, and extortion are severe enough to rise to the level of torture is a legal question. While the underlying facts vary from petitioner to petitioner, the legal question remains the same: do the facts found by the IJ (and that the BIA determines are not clearly erroneous) meet the legal requirements for relief under the CAT?

Pierre v. Att'y Gen., 528 F.3d 180, 184 (3d Cir. 2008) (en banc) (quoting 8 U.S.C. § 1252(a)(2)(C)-(D)) (internal quotation marks omitted). Additionally, as the government concedes,[7] this Court has jurisdiction to determine whether the Board adjudicated Pieschacon-Villegas's application for deferral of removal under an incorrect legal standard.

The government mischaracterizes the BIA's decision, at least in part, when it contends that the BIA applied the correct legal standard. Despite acknowledging that government acquiescence can be demonstrated by showing that the government is willfully blind to torturous activities, the BIA incorrectly stated that a number of specific circumstances cannot constitute acquiescence. Furthermore, the BIA misapplied the legal standard by ignoring evidence relevant to determining whether Pieschacon-Villegas will more likely than not be subjected to torture upon removal. Although the BIA has discretion to hold that this evidence is insufficient to meet Pieschacon-Villegas's burden, the BIA lacks authority to ignore this evidence altogether.

When the BIA issues its own decision on the merits, rather than a summary affirmance, we review its decision, not that of the IJ. Sheriff v. Att'y Gen., 587 F.3d 584, 588 (3d Cir. 2009). We review legal determinations de novo, subject to the principles of deference articulated in Chevron v. Nat. Res. Def. Council, 467 U.S. 837, 844 (1984). Briseno-Flores v. Att'y Gen., 492 F.3d 226, 228 (3d Cir. 2007).

---

Id.
[7] (Respondent's Br. at 20.)

## III. <u>ANALYSIS</u>

### A. **Article 3 of CAT**

Under Article 3 of CAT, "[n]o State Party shall . . . expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Art. 3(1), S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. We have stated that

> For an act to constitute torture under the [CAT] and the implementing regulations, it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

<u>Auguste v. Ridge</u>, 395 F.3d 123, 151 (3d Cir. 2005).

An applicant for relief under Article 3 of CAT "bears the burden of establishing 'that it is more likely than not that he or she would be tortured if removed to the proposed

14

country of removal.'"[8] <u>Sevoian v. Ashcroft</u>, 290 F.3d 166, 174-75 (3d Cir. 2002) (quoting 8 C.F.R. § 208.16(c)(2)). The applicant must establish that he or she, more likely than not, will be subjected to torturous acts inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1) (2006).

**B.     Acquiescence**

"Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene and prevent such activity." 8 C.F.R. § 1208.18(a)(7). "If an alien produces sufficient evidence to satisfy that burden, withholding of removal or deferring of removal is mandatory." <u>Silva-Rengifo v. Att'y Gen.</u>, 473 F.3d 58, 64 (3d Cir. 2007) (citing 8 C.F.R. § 1208.16–.18).

The acquiescence that must be established for deferral of removal does not require that the government have actual knowledge of the torturous activity; instead, governmental acquiescence may be shown "by producing sufficient evidence that the government in question is willfully blind to such activities." <u>Id.</u> at 65; <u>see also</u> <u>Gomez-Zuluaga v. Att'y Gen.</u>, 527 F.3d 330, 350 (3d Cir. 2008) (quoting <u>Silva-Rengifo</u>, 473 F.3d at 65).

---

[8] "An 'alien's testimony, if credible, may be sufficient to sustain the burden of proof without corroboration.'" <u>Kamara v. Att'y Gen.</u>, 420 F.3d 202, 213 (3d Cir. 2005) (quoting <u>Zubeda v. Ashcroft</u>, 333 F.3d 463, 471 (3d Cir. 2003)).

In its decision regarding Pieschacon-Villegas, the BIA made three unqualified statements regarding different circumstances under which a government is not willfully blind and does not acquiesce: (1) when a government is unable to control the entities carrying out the torture; (2) when a government actively opposes the entities that the applicant fears; and (3) when the only evidence is the existence of a pattern of flagrant or mass violations of human rights within the country.

### i. Government Inability to Control

In its decision, the BIA stated that CAT "protection does not extend to persons who fear entities that a government is unable to control." In re Pieschacon-Villegas, A049 191 076, at 2 (BIA Dec. 3, 2009). In Silva-Rengifo, however, we noted that, "although a government's ability to control a particular group may be relevant to an inquiry into governmental acquiescence under the CAT, that inquiry does not turn on a government's 'ability to control' persons or groups engaging in torturous activity." 473 F.3d at 65.

In Gomez-Zuluaga, we reaffirmed the possibility that the Colombian government could be willfully blind and thus be found to have acquiesced, even if it was unable to control those engaged in torturous activity. 527 F.3d at 350–51. In that case, we held that two government representatives each telling the petitioner that "there was nothing they could do to protect her" from the FARC "may be circumstantial evidence that the Colombian government was willfully blind to such treatment and that to pursue official assistance would have been futile." Id. at 351 (remanding to the BIA for consideration in light of the proper standard, namely that articulated in Silva-Rengifo).

16

The BIA's assumption that "[CAT] protection does not extend to persons who fear entities that a government is unable to control" contradicts our holdings in <u>Silva-Rengifo</u> and <u>Gomez-Zuluaga</u> that a government's ability to control groups engaged in torturous activities may be relevant to, but is not dispositive of, an assessment of willful blindness. <u>In re Pieschacon-Villegas</u>, A049 191 076, at 2 (BIA Dec. 3, 2009). The BIA should conduct a review that takes into account our precedent that an applicant may be able to establish governmental acquiescence in some circumstances, even where the government is unable to protect its citizens from persecution.

### ii. Government Opposes Entities Carrying out Torture

The BIA stated in its decision that it "reject[ed] [Pieschacon-Villegas's] argument on appeal that the Colombian government would acquiesce to his torture under a willful blindness theory" because "the record reflects that the Colombian government actively opposes the organizations that the respondent fears." <u>In re Pieschacon-Villegas</u>, A049 191 076, at 2 (BIA Dec. 3, 2009) (internal citation omitted). We held, however, in <u>Gomez-Zuluaga</u>, that "[t]he mere fact that the Colombian government is engaged in a protracted civil war with the FARC does not necessarily mean that it cannot remain willfully blind to the torturous acts of the FARC." 527 F.3d at 351. Gomez-Zuluaga had submitted country reports stating that the Colombian government was aware that the FARC routinely tortured, mutilated, and killed people and that "paramilitaries sympathetic to the government often engage in similar activities with tacit approval from the government." <u>Id.</u> In that case, we held that there may be tacit governmental

17

approval of, and willful blindness toward, the torturous activities of an entity, even if the Colombian government is engaged in a war with that entity.

The BIA should conduct a review that takes into account our precedent that an applicant can establish governmental acquiescence even if the government opposes the paramilitary organization that is engaged in torturous acts.[9]

_____

[9] In De la Rosa v. Holder, 598 F.3d 103 (2d Cir. 2010), the Second Circuit remanded to the BIA a matter with facts strikingly similar to those in Pieschacon-Villegas. There, the court noted that the BIA appeared to have assumed that some government officials previously taking action to prevent De la Rosa's torture "overrides both the complicity of other government actors and the general corruption and ineffectiveness of the Dominican government in preventing unlawful killings." Id. at 110. The court continued that

> [I]t is not clear to this Court why the preventative efforts of some government actors should foreclose the possibility of government acquiescence, as a matter of law, under the CAT. Where a government contains officials that would be complicit in torture, and that government, on the whole, is admittedly incapable of actually preventing that torture, the fact that some officials take action to prevent the

18

### iii. Country Conditions

The BIA noted in its decision that "the existence of a consistent pattern of gross, flagrant, or mass violations of human rights in a particular country does not, as such, constitute sufficient grounds for determining that a particular person would be in danger of being subject to torture upon his return to that country." In re Pieschacon-Villegas, A049 191 076, at 2 (BIA Dec. 3, 2009). In Zubeda v. Ashcroft, 333

> torture would seem neither inconsistent with a finding of government acquiescence nor necessarily responsive to the question of whether torture would be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."

Id. The Second Circuit remanded, asking the BIA to "issue a precedential opinion on whether, as a matter of law, a government may acquiesce to a person's torture where (1) some officials attempt to prevent that torture (2) while other officials are complicit, and (3) the government is admittedly unable to actually prevent the torture from taking place." Id. at 110–11. Unlike De la Rosa, where the Second Circuit said the BIA "appears to have assumed" this proposition, in the BIA's decision regarding Pieschacon-Villegas, the BIA explicitly stated these propositions that contradict our precedent.

19

F.3d 463 (3d Cir. 2003), however, we held that "[o]fficial as well as unofficial country reports are probative evidence and can, by themselves, provide sufficient proof to sustain an alien's burden under the INA." Id. at 477 (citing Kamalthas v. INS, 251 F.3d 1279, 1284 (9th Cir. 2001)). "'[G]ross, flagrant or mass violations of human rights within the country of removal . . .' can corroborate an alien's claim that he/she will be subjected to torture upon return; thus allowing the alien to present the proof necessary for establishing a claim under the Convention Against Torture." Id. at 478 (quoting 8 C.F.R. § 208.16(c)(3)) (citing Kamalthas, 251 F.3d at 1284) (remanding to the IJ because "[t]he BIA's de novo analysis never considers this" possibility).

The BIA should conduct a review that is not in tension with our precedent that country conditions can, by themselves, constitute sufficient grounds for determining that an applicant would more likely than not be subjected to torture upon return to the country of removal.

## C. Considering all relevant evidence and facts found by IJ

When the IJ or BIA analyzes whether it is more likely than not that an applicant seeking relief would be tortured if removed to the proposed country of removal, it must consider

> all evidence relevant to the possibility of future torture shall be considered, including but not limited to:
>
> (i) Evidence of past torture inflicted upon the applicant;

20

(ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;

(iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and

(iv) Other relevant information regarding conditions in the country of removal.

8 C.F.R. § 208.16(c)(3) (emphasis added); see also Lavira v. Att'y Gen., 478 F.3d 158, 171 (3d Cir. 2007) ("IJs are obligated to consider 'all evidence relevant to the possibility of future torture' (quoting 8 C.F.R. § 208.16(c)(3)), overruled on other grounds by Pierre v. Att'y Gen., 528 F.3d 180 (3d Cir. 2008); McAllister v. Att'y Gen., 444 F.3d 178, 189 (3d Cir. 2006) ("In its assessment of whether an alien will likely be tortured in the country of removal, the BIA must consider 'all evidence relevant to the possibility of future torture,' including 'information regarding conditions in the country of removal." (quoting 8 C.F.R. § 208.16(c)(3)); Kamara v. Att'y Gen., 420 F.3d 202, 213 n.8 (3d Cir. 2005); Sevoian v. Ashcroft, 290 F.3d 166, 175 (3d Cir. 2002) ("Decision-makers evaluating claims under the Convention should pay attention to 'evidence of past torture inflicted upon the applicant' as well as considering all other relevant evidence." (quoting 8 C.F.R. § 208.16(c)(3)(i) (citing 8 C.F.R. § 208.16(c)(3))).

The BIA decision does not show that the Board considered "all evidence relevant to the possibility of future torture." Further, the BIA decision does not reference or show a meaningful consideration of relevant evidence discussed in the IJ's decision; the IJ's findings regarding Pieschacon-Villegas's credibility;[10] the threats allegedly made against Pieschacon-Villegas and his family and that Amezquita allegedly told others that Pieschacon-Villegas was a "rat;" the FBI's alleged recommendation that Pieschacon-Villegas's wife not return to Colombia for her own safety; or the alleged attempt to harm Pieschacon-Villegas in the 2007 Barranquilla jail incident.

Additionally, although the BIA decision referenced country reports in the record, the decision does not indicate that the BIA considered that those country reports indicated that a number of government officials have been suspected of, or charged with, civil rights violations or involvement in paramilitary atrocities, including murder and forced disappearances, or that the Colombian government claims that all paramilitary organizations have demobilized despite abundant evidence to the contrary.

As one of the Board's reasons for dismissing Pieschacon-Villegas's appeal, the BIA noted that "[s]pecific grounds must exist that indicate the respondent would be personally at risk." In re Pieschacon-Villegas, A049 191 076,

---

[10] The IJ found credible Pieschacon-Villegas's testimony that he cooperated with the FBI in operations targeting criminal organizations and involving individuals with ties to the AUC. The IJ also found credible Pieschacon-Villegas's testimony that his cooperation with the FBI would endanger his life if he returned to Colombia.

22

at 2 (BIA Dec. 3, 2009). The BIA did not explicitly deem clearly erroneous the IJ's finding of credibility regarding Pieschacon-Villegas's testimony that his cooperation with the FBI would endanger his life if he returned to Colombia. Similarly, the Board did not offer reasons for implicitly concluding that there was no record evidence of specific grounds that Pieschacon-Villegas would be personally at risk. The BIA decision did not explain why none of the evidence, including evidence or testimony of Pieschacon-Villegas's cooperation with the FBI in targeting paramilitary organizations, the alleged threats, the alleged prior attempt to harm him, and the information contained in the country reports, constituted a specific ground indicating that he would be personally at risk. Although the BIA has the discretion to find that, despite the relevant evidence, Pieschacon-Villegas has not shown that he is more likely than not to be subjected to torture if removed to Colombia, the BIA lacks authority to ignore any "evidence relevant to the possibility of future torture" when making that determination. 8 C.F.R. § 208.16(c)(3)

## IV. CONCLUSION

For the reasons set forth above, we will grant the petition for review and remand to the BIA for further proceedings consistent with this opinion.

23