**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2404
_____

JOSE MELGAS ORELLANA,
AKA Jose Melgar Orellana, AKA Jose Melgarorellana,
Petitioner

v.

ATTORNEY GENERAL
OF THE UNITED STATES OF AMERICA,
Respondent.
_____

On Petition for Review from a Final Order
of the Board of Immigration Appeals
(Agency No. A098-988-957)
Immigration Judge: Nelson Vargas Padilla
_____

Argued: February 5, 2020
_____


Before: CHAGARES, RESTREPO, and BIBAS, *Circuit Judges*.

(Filed: April 3, 2020)



Oscar J. Barbosa
Diaspora Law
310 Morris Avenue Suite 302
Elizabeth, NJ 07208

Stephen Hildebrand [*ARGUED*]
Gallo Hildebrand
10 East Athens Avenue Suite 210b
Ardmore, PA 19003

*Counsel for Petitioner*

Yanal H. Yousef [*ARGUED*]
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

*Counsel for Respondent*

_____

# OPINION[*]
_____

RESTREPO, *Circuit Judge*.

Jose Melgar Orellana,[1] a non-citizen and gay man from El Salvador, petitions for review of the denial of his application for withholding of removal under the Immigration and Nationality Act (INA) and protection under the Convention Against Torture (CAT). Melgar claims that members of major gangs in El Salvador repeatedly raped and sexually assaulted him and extorted him under threats of sexual violence, on account of his sexual orientation, and that the Salvadoran government acquiesced in this conduct.

Because neither the Board of Immigration Appeals (BIA) nor the Immigration Judge (IJ) properly addressed these claims or the material evidence in the record, we are

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.
[1] Petitioner refers to himself as "Melgar," so we will use that name here.

unable to meaningfully review their decisions.  Therefore, we will vacate the BIA's decision and remand for reconsideration consistent with this opinion.

## I.  BACKGROUND

### A.  Melgar's Experience

Melgar began to identify as gay when he was a young boy.  As he grew into adolescence, gang members started noticing and harassing him.  Around age thirteen, he was raped by five men, whom he identified as members of MS-13 or "Mara MS," a major Salvadoran gang, because of their tattoos and clothes.  AR73.  The men threatened to kill him if he told the police, so he kept quiet.  He believes he was targeted by these men because he is gay.  After the rape, he became depressed and attempted suicide.

A few years later, Melgar moved with a gay friend, who was also being harassed by the gangs, to another municipality about three hours away.  Soon, another major gang, "Mara 18," began to sexually harass the two young men with vulgar taunting and touching.  AR76.  Melgar explained that the gang members "quickly noted that we were gay and they assaulted and abused us."  AR371.  He believes that gangs single out gay men like him based on societal stereotypes associated with their appearance and mannerisms: "You can distinguish us by the way we walk, we act, we dress.  It is different from [others]."  AR74 (Tr. 23:11-12).  He stated: "Everywhere I go people know I'm gay because [it] is not something I hide."  AR363.

Hoping to escape the ongoing abuse, Melgar returned to live with his parents.  At first, he was able to avoid the gangs, but eventually MS-13 identified him, and the harassment continued—worse than before.  On one occasion, after a gay friend was raped

3

and murdered, left dead with a tree branch "in his private part," AR78, gang members followed Melgar and warned him that he would be killed like his friend unless he submitted to their sexual demands. Melgar and his friends reported some of these incidents to the police, but the police did not take them seriously. The police would tell them that these things happen to gay men because they are "looking for it because that is what [they] like[]." AR371.

When he was twenty-five years old, Melgar married a woman who was aware of his sexuality, and they started a family. He hoped that the marriage would end the abuse and discrimination, because it would show that he was a "real" man. AR81. It did not work. The discrimination and abuse continued.

Eventually, gang members started to demand "rent," a common form of monetary extortion in gang-controlled areas. AR81. They demanded a higher than usual rent from Melgar "just for the fact of being gay." AR372. In 2005, gang members came to his house with guns and knives demanding more rent. When he was unable to pay, they threatened to rape and kill him in front of his wife and children. Melgar fled to the United States and entered without authorization.

About three years later, Melgar was detained and removed to El Salvador. As soon as he arrived in early 2009, MS-13 gang members came to his home and demanded the rent that they claimed he owed them. They pointed a gun to his head and gave him hours to come up with the money. Again, they threatened to rape and kill him in front of his family if he did not pay. The next day, Melgar fled to the United States for a second time.

4

## B. Removal Proceedings

About ten years later, in 2018, the Department of Homeland Security detained Melgar. An asylum officer determined that he demonstrated a reasonable fear of persecution based on his sexual orientation and referred him to an IJ. Melgar applied for withholding of removal under the INA and protection under CAT based on his experience with the gangs and his fear that they are still looking for him. He submitted several affidavits and country conditions reports. The Government did not object to any of this evidence nor submitted any rebutting evidence.

The IJ found Melgar's "claim to be credible," AR96, but denied his application in full. With respect to withholding of removal, the IJ noted that Melgar had submitted "insufficient information" to show that his sexual orientation was the gangs' "one central reason for pursuing" him or that he was singled out for abuse "simply because he is a gay man." AR40. On his CAT claim, the IJ concluded that the Salvadoran government did not perpetrate or acquiesce in the violence he suffered.

Melgar appealed to the BIA, which dismissed the appeal. The BIA agreed that Melgar presented "insufficient evidence" to establish that his sexual orientation was "a central reason" for the mistreatment he received or may likely encounter in El Salvador. AR3. With respect to CAT, the BIA stated that Melgar "has not submitted any evidence" to show that he was tortured by or with the acquiescence of the Salvadoran government. AR4. The BIA found that any future torture was "speculative," concluding that Melgar failed to show that it was "more likely than not" that he would be tortured with the acquiescence of the Salvadoran government. *Id*.

5

Melgar timely petitioned this Court for review of the BIA's decision.[2]

## II. STANDARD OF REVIEW

When the BIA adopts the IJ's findings and adds its own gloss, we review both the BIA's and the IJ's decisions. *Gonzalez-Posadas v. Att'y Gen. U.S.*, 781 F.3d 677, 684 n.5 (3d Cir. 2015). We review legal questions *de novo*, with appropriate deference to the BIA's interpretations of the INA, and defer to factual findings if supported by substantial evidence. *Valdiviezo-Galdamez v. Att'y Gen. U.S.*, 663 F.3d 582, 590 (3d Cir. 2011).

"[T]o give meaningful review to the BIA's decision, we must have some insight into its reasoning." *Awolesi v. Ashcroft*, 341 F.3d 227, 232 (3d Cir. 2003). While the BIA and the IJ are not required to write a legal tome, vague statements such as "[t]he evidence is insufficient" are too thin a reed upon which to deny relief, especially when the IJ credits the applicant's testimony yet the BIA offers no reasons for disregarding relevant testimony and corroborative evidence. *Id.* at 232-33.

## III. DISCUSSION

Melgar challenges the BIA's determination that he failed to present sufficient evidence to sustain his claims under both the INA and CAT. We address each in turn.

### A. Withholding of Removal under the INA

Under the INA, a non-citizen cannot be removed to a country where his "life or freedom would be threatened . . . because of" any one of the statutorily protected grounds such as "membership in a particular social group." *Gonzalez-Posadas*, 781 F.3d at 684

---

[2] The BIA had jurisdiction under 8 C.F.R. §§ 1003.1(b) and 1240.15. We have jurisdiction under 8 U.S.C. § 1252(a).

6

(quoting 8 U.S.C. § 1231(b)(3)(A)).  The applicant bears the burden of showing "that he will more likely than not face persecution on account of one of those protected grounds." *Id*.  If the applicant proves he was persecuted in his home country because of his protected status, he is entitled to a rebuttable presumption that his "life or freedom would be threatened" on the same basis if removed to that country.  *Id*.  Relief is premised on showing, among others, that the proposed social group is cognizable and that membership in that group is "one central reason" for the persecution.  *Id.* at 684-85 (citation omitted).

It is undisputed that, as a gay or bisexual man, Melgar is a member of a cognizable social group based on his sexual orientation, namely the lesbian, gay, bisexual, transgender and intersex (LGBTI) community in El Salvador.  *See Sumaila v. Att'y Gen. U.S.*, __ F.3d __, No. 18-1342, 2020 WL 1527070, at *4 (3d Cir. March 31, 2020).  The issue is whether the IJ and the BIA properly rejected Melgar's claim on the grounds that he presented "insufficient evidence" to show that his sexual orientation was "one central reason" for the persecution he suffered, and may again face, in El Salvador.  AR3, 40.

To satisfy this requirement, Melgar must demonstrate that his persecutors knew or believed he was gay and acted on account of that characteristic.  *Valdiviezo-Galdamez*, 663 F.3d at 609.  There is no dispute that the gangs knew or assumed Melgar is gay, so our focus is on whether that knowledge motivated the actions of his persecutors.

To meet his burden of proof, an applicant must provide some evidence of his persecutors' motives.  *Gonzalez-Posadas*, 781 F.3d at 685 (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992)).  But "direct proof" is not required; circumstantial evidence is enough.  *Elias-Zacarias*, 502 U.S. at 483.  The nature and context of the harm

7

itself—the chosen method of harm, the locus of the harm, societal stereotypes or stigmas associated with the harm—may provide a window into the persecutors' motives. *See Espinosa-Cortez v. Att'y Gen. U.S.*, 607 F.3d 101, 109 (3d Cir. 2010) ("[C]ircumstantial evidence of motive may include, *inter alia,* the timing of the persecution and signs or emblems left at the site of persecution." (quoting *Canales-Vargas v. Gonzales,* 441 F.3d 739, 744 (9th Cir. 2006)); *Mohammed v. Gonzales*, 400 F.3d 785, 798 (9th Cir. 2005) ("[T]here is little question that genital mutilation occurs to a particular individual *because* she is a female," *i.e.*, "being female is a motivating factor—if not a but-for cause—of the persecution."). The applicant's "[t]estimony, by itself, is sufficient to meet this burden, if credible." *Espinosa-Cortez*, 607 F.3d at 108 (quoting *Singh v. Gonzales,* 406 F.3d 191, 195 (3d Cir. 2005) (alteration in original)).

In rejecting Melgar's claim for insufficient evidence of an anti-gay motive, the IJ found that Melgar was no different from any other "unfortunate victim of gang violence." AR40 (relying on *Matter of A-B-*, 27 I & N Dec. 316 (A.G. 2018)). He noted that gangs "extort money from folks regardless of their sexual orientation" and "pursue criminal activities, which includes violence, extortion, robbery and assault, against the general population[.]" AR40. The IJ did not separately analyze the claim of *sexual* violence. In affirming the IJ's determination, the BIA noted that it was "regrettable" that Melgar was a victim of "sexual assault and extortion" but focused only on the motives for the extortion, emphasizing that "gang members tend to extort money from people regardless of their sexual orientation." AR3-4. The BIA thus concurred that Melgar was a "victim

8

of gang violence, which by itself is not a basis for withholding of removal[.]" AR3 (citing *Matter of A-B-*).

We agree with the Government that the IJ and the BIA properly found that Melgar failed to show a nexus between his sexual orientation and the gangs' violent monetary extortion efforts that are directed indiscriminately at the general population. However, that was not the entire basis of Melgar's claim. He asserted that the gangs targeted him and other gay men specifically with sexual violence and "heightened persecution." AR14. He argued that the "highly sexual nature of the threats and attacks suffered both by [him] and by other similarly situated individuals" is further evidence that they were targeted because of their sexual orientation. AR13. He explained that, "[u]nlike many in Salvadoran society – and especially unlike heterosexual men," AR14, gay and bisexual men are targeted with sexual violence "because of their already diminished social status," AR13. According to Melgar, gang members believe they can assert their sense of superiority by dominating gay men sexually, *i.e.*, by taking them "by force like their women," because of their non-conforming sexual orientation or identity. AR13. Neither the IJ nor the BIA engaged directly with that claim. While Melgar could have developed this argument more fully, the basis of this claim was palpable throughout his testimony, both written and oral, and the supporting evidence he submitted.

In his testimony, Melgar acknowledged that the gangs go after "everyone," but he emphasized that they "do damage, but more to us, the gays for being gay." AR93. He stated, "[i]n addition to these gangs dominating the country," MS-13 and Mara 18 "give special attention to us the gay community." AR370. He explained that, in El Salvador,

9

the culture is "sexist," and gay people are viewed as "not normal." *Id.* In that context, gang members believe they can "show their power" by subordinating or demeaning gay men through sexual violence and harassment, because "[f]or these gangs the homosexuals are more worthless than any other person." *Id.* He stated: "They make fun of us, assault us, abuse us, and they take us by force like their women." *Id.*

Melgar testified that he knows other gay men who were victimized by the gangs, because they were gay. His friend, Ovidio, was raped by gang members, causing him to be infected with HIV. He later died of AIDS. Gang members gruesomely murdered another friend, Balmure, whose body was left with a tree branch in his anus so people would "know that's how they rape the gays." AR78; *see* 371. *See Karouni v. Gonzales*, 399 F.3d 1163, 1174 (9th Cir. 2005) ("[W]e agree with Karouni that shooting Khalil in the anus is essentially *res ipsa loquitor* [sic] evidence, or an '[o]bvious sign[],' that Khalil was shot because he was a homosexual." (internal citations omitted) (third and fourth alterations in original)). After the murder, gang members warned Melgar that the same thing would happen to him. The IJ credited Melgar's testimony without qualification, yet neither the IJ nor the BIA explained why they disregarded these aspects of his account.

In addition, Melgar submitted several affidavits of friends and relatives, including his wife who still lives in El Salvador, corroborating his claim that the gangs targeted him and other gay men with sexual violence and heightened abuse because of their sexual orientation. His wife explained, "[I]f the gangs realize that [a person] is gay, they will want to subject him to rapes or assaults of a sexual nature." AR103. She noted that

10

people have always known (or assumed) that Melgar is gay because he is "mannered," and that he was sexually harassed, abused and threatened because he is gay. AR102.

A gay friend of Melgar's daughter, who often spent time at their home, witnessed the abuse directed at Melgar and had similar experiences because of his sexual orientation. He stated that "one of the most frequent violent acts" in El Salvador is violence against members of the LGBTI community. AR109. He noted that gangs extort people generally but added, "[I]f it involves a person with homosexual tendencies, they make them suffer, they try to rape them, beat them, to subject them to what[ever] they decide." AR110. In a letter, the mayor of Melgar's hometown in El Salvador stated that Melgar fled "for reasons of insecurity that cuts through our country," including "harassment, death threats and total discrimination towards his person for belonging to the LGBTI community[.]" AR107.

Melgar proffered multiple reports from reputable human rights organizations and news media on the conditions of the LGBTI community in El Salvador. These reports suggest that anti-gay violence and discrimination remains a serious problem in El Salvador. For instance, in a 2017 report titled, "No Safe Place," Amnesty International described the situation of LGBTI individuals in the "Northern Triangle Region," which includes El Salvador as noted on the cover. AR413. The report states:

> [T]here is evidence that [LGBTI people] are particularly exposed to violence in the Northern Triangle countries, and that *this is related intrinsically to the multiple forms of discrimination that LGBTI people face* in the different spheres of their family and working life, as part of society more widely and institutionally, *on the basis of their gender identities and/or sexual orientation*.

11

AR416 (footnotes omitted) (emphasis added). The report includes several stories of LGBTI persons who have suffered the same sort of sexual violence as Melgar.

Other reports support Melgar's claim that the gangs amplify Salvadoran society's sexist or homophobic views through targeted violence against LGBTI individuals. A Reuters report from 2017 explored the interrelation between broader homophobic attitudes and gang violence in El Salvador. It states: "Not only are LGBT people victims of general gang violence, like other Salvadorans, they are also persecuted because of their sexual orientation." AR410. According to a report by InSight Crime, as recently as 2015, "there was a rash of prominent attacks carried out against members of the LGBTI community in El Salvador." AR393. These crimes were "not isolated," and "they generally follow[ed] a certain pattern." *Id.* In particular, the report referenced a 2012 study on Sexual Diversity in El Salvador from the International Human Rights Law Clinic at the University of California, Berkeley, citing instances of gangs requiring new recruits, as part of their initiation, to target LGBTI individuals.

The record also contains evidence that MS-13 prohibits gay members and kills those suspected of being gay, a practice that is rooted in the gang's "deeply misogynistic, macho and homophobic" culture. AR398. That assessment was based on a "report written by several non-governmental organizations," titled "Violent and Violated: Gender Relations in the Mara Salvatrucha and Barrio 18."[3] AR398. It states: "[H]omosexuality

---

[3] Mara Salvatrucha or MS and Barrio 18 are different names for MS-13 and Mara 18, respectively.

12

is unthinkable for gangs and their members, unless it occurs within the framework of rape as a form of punishment." AR398-99. The Amnesty International report confirms that gangs "are governed by highly sexist codes of conduct, and they often attack LGBTI people for [their] real or perceived [ ] gender identity or sexual orientation, subjecting them to acts of physical and sexual abuse, as well as blackmail." AR420.

None of this evidence features in the IJ's or the BIA's decision, and that was error. Although we do not expect the BIA "to expressly parse each point or discuss each piece of evidence presented, . . . it may not ignore evidence favorable to the [applicant]." *Fei Yan Zhu v. Att'y Gen.*, 744 F.3d 268, 272 (3d Cir. 2014) (internal quotation marks and citations omitted). If the BIA intended to reject the affidavits or country reports, it should have given an "explanation as to why[.]" *Id.* As this Court has explained, the "BIA must provide sufficient analysis to demonstrate that it has truly performed a full review of the record[.]" *En Hui Huang v. Att'y Gen. U.S.*, 620 F.3d 372, 388 (3d Cir. 2010) (vacating and remanding when the BIA ignored favorable evidence).

We note that the IJ and the BIA seemed to lump Melgar—almost automatically—into a generic group of "victims of gang violence" under the Attorney General's recent guidance in *Matter of A-B-,* based solely on the fact that he was a victim of the gangs' violent monetary extortion efforts. Under that rationale, however, persecutory acts by the gangs would always be subsumed into the category of "gang violence," and members of cognizable social groups who are singled out and stigmatized with particular types of harms would be categorically disqualified from protection simply because they happened to be victimized by the gangs. That is not the law. The BIA must address the applicant's

13

specific claim, regardless of whether it arises in the context of "general social unrest" or criminal conduct. *Vente v. Gonzales*, 415 F.3d 296, 301-03 (3d Cir. 2005) (remanding for reconsideration of the applicant's specific claim); *accord Crespin-Valladares v. Holder*, 632 F.3d 117, 127 (4th Cir. 2011) ("The BIA's observation that 'the criminal activities of MS-13 affect the population as a whole' is beside the point. Crespin complains not of a fear of the general 'criminal activities' of MS-13, but of a series of targeted and persistent threats directed at him and his family." (footnote omitted)). As shown above, a fair reading of Melgar's testimony and other evidence reveals that he was setting out the basis of a particularized claim, distinct from and compounded by general gang violence. In addition to complaining about monetary extortion, Melgar complains of anti-gay persecution in the form of sexual violence and heightened abuse. The IJ and BIA erred in treating these two claims as one and the same.

Contrary to the Government's suggestion, our decision in *Gonzalez-Posadas* does not foreclose this claim. There, the applicant claimed that, as a child, he was repeatedly raped by his cousin who happened to be a gang member, but there was no evidence linking these "isolated criminal acts" to *his* sexual orientation or a pattern or practice of homophobic violence *by the gangs*. 781 F.3d at 686-87, 688. He also claimed that he was a victim of the gangs' monetary extortion and recruitment efforts and was subjected to verbal abuse in the form of gay slurs and sexual threats, *id*. at 682, but he testified inconsistently as to the gangs' motives for those actions, *id*. at 679-81, 686, leading the IJ to question his credibility, *id*. at 683. The court upheld the BIA's determination that the gangs were motivated by their own monetary and recruitment objectives not the

14

applicant's sexual orientation, reasoning that their "abusive language" was only a means of achieving those ends. *Id*. at 686-87.

The Government argues that, as in *Gonzalez-Posadas*, the gangs "were seeking to enrich themselves by means of violence," Oral Ar. 19:00-06, and that the sexual threats that ultimately led Melgar to flee were "incidental" to those monetary objectives, *id*. at 19:28-45. That argument falls short, because as explained above, Melgar's claim is not based solely or even primarily on monetary extortion, but rather on anti-gay persecution in the form of sexual violence and intimidation. That Melgar waited to flee until he was threatened to be raped and killed in front of his family does not erase the history of sexual abuse and harassment that he experienced at the hands of the gangs since he was a child long before they ever started demanding rent.

Furthermore, persecutors may have different motives for different actions, or multiple motives for the same action, so long as a protected characteristic is one central reason, among others, for any part of their harmful conduct. *Espinosa-Cortez*, 607 F.3d at 108 (citing *Singh,* 406 F.3d at 197). While the protected characteristic "must be an essential or principal reason for the persecution," not an "incidental, tangential, or superficial" reason, *Gonzalez-Posadas*, 781 F.3d at 685 (quoting *Ndayshimiye v. Att'y Gen. U.S.*, 557 F.3d 124, 130 (3d Cir. 2009)), it does not need to be the "dominant" reason for the abuse, *i.e.*, it may be "subordinate" to other neutral motives, *Ndayshimiye*, 557 F.3d at 129-30.

Although gangs may be motivated primarily by monetary gain for extorting rent, it does not necessarily follow that Melgar's sexual orientation was not "an essential or

15

principal reason" for the history of sexual abuse he experienced, culminating with the gangs' threats to rape and kill him (like they did with his gay friend). Unlike the applicant in *Gonzalez-Posadas*, here, Melgar consistently testified that he was targeted by gangs with sexual abuse because he is gay, and he submitted several affidavits corroborating that claim. And the record is replete with country conditions evidence linking this sort of mistreatment to a pattern and practice of sexual violence and targeted abuse by these gangs against LGBTI individuals.

In sum, because we are not convinced that the IJ or the BIA properly addressed Melgar's specific sexual violence claim, we will remand for reconsideration.

### B. Protection from Removal under CAT

We now turn to Melgar's CAT claim. Under CAT, the applicant bears the burden of establishing "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Dutton-Myrie v. Att'y Gen. U.S.*, 855 F.3d 509, 515 (3d Cir. 2017) (quoting 8 C.F.R. § 1208.16(c)(2)). For an act to be "torture," it must be an intentional, unlawful act causing severe physical or mental pain or suffering "by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim." *Id.* (quoting *Auguste v. Ridge*, 395 F.3d 123, 151 (3d Cir. 2005)). There is no question that rape, credible "threats to rape," and "other forms of sexual violence" can be torturous acts. *Zubeda v. Ashcroft*, 333 F.3d 463, 472-73 (3d Cir. 2003) (collecting cases and other authorities). The issue is whether Melgar's claim was properly denied on the grounds that he failed to present enough evidence to establish that

16

it was more likely than not that he would be tortured by or with the acquiescence of the Salvadoran government.

For a government to acquiescence in the torturous conduct of private actors, a public official must have been "aware of [the activity] and thereafter breached the legal responsibility to intervene and prevent it." *Dutton-Myrie*, 855 F.3d at 516 (citing 8 C.F.R. § 1208.18(a)(7)). An official does not need to have actual knowledge of the specific torturous acts if there is "evidence that the government [ ] is willfully blind to such activities." *Id*. (quoting *Silva-Rengifo v. Att'y Gen. U.S.*, 473 F.3d 58, 65 (3d Cir. 2007)). "Circumstantial evidence may establish acquiescence to targeted acts of violence even when the government has an official policy or is engaged in a campaign of opposition against the entity the applicant fears." *Id.*; *accord Quinteros v. Att'y Gen. U.S.*, 945 F.3d 772, 788 (3d Cir. 2019); *see Quinteros*, 945 F.3d at 793 & n.31 (McKee, J., concurring) (emphasizing that the conduct of public officials at any level may entail responsibility, even if the highest levels would disapprove (citing *Madrigal v. Holder*, 716 F.3d 499, 510 (9th Cir. 2013)); *Rodriguez-Molinero v. Lynch*, 808 F.3d 1134, 1139 (7th Cir. 2015) ("The petitioner did not have to show that the entire Mexican government is complicit in the misconduct of individual police officers.").

To perform this analysis, the IJ must first make factual findings as to "how public officials will likely act in response to the harm the petitioner fears" and then determine "whether the likely response from public officials qualifies as acquiescence under the governing regulations." *Dutton-Myrie*, 855 F.3d at 516. Here, the IJ found that it was "abundantly clear" that the Salvadoran government has not acquiesced in Melgar's

17

situation based solely on the letter from Melgar's hometown mayor noting his "plight and difficulties." AR40. The BIA added that Melgar had "not submitted any evidence" establishing the Salvadoran government's acquiescence. AR4. That analysis is wanting.

The sympathetic views of one mayor are not dispositive of the entire Salvadoran government's willingness to protect LGBTI individuals from private acts of torture, especially given Melgar's credible testimony and other evidence to the contrary. Recall that Melgar testified that he and his friends reported some of the instances of sexual abuse to the police, but they responded dismissively by saying that gay men are "looking for it," AR371, meaning that they are asking to be raped and sexually assaulted. When his gay friend was brutally raped and murdered, the police picked up the body but did nothing to investigate or prosecute the perpetrators. Melgar explained: "[T]he government doesn't do anything for the gay society. The police doesn't cooperate with the gay society, . . . because over there, gays, we are very discriminated by the whole society." AR90.

Melgar submitted third-party reports to support his assertion that law enforcement turns a blind eye to the specific dangers afflicting the LGBTI community. InSight Crime reported that human rights workers collected data identifying both gang members and police officers as "the principal perpetrators of violence against members of the LGBTI communities in El Salvador[.]" AR392. Human rights workers had to investigate these incidents, "because there is no public agency in El Salvador that registers the sexual orientation or gender identity of homicide victims." AR393. The report noted that crimes against LGBTI persons "go systematically unprosecuted." *Id*. The Berkeley

Human Rights Report also documented "rape, abuse, and physical attacks carried out by police officers against gay men," and echoed "concerns regarding lack of investigation and prosecution of violence against the LGBTI community." AR394.

Other evidence raises questions about the Salvadoran government's commitment to protecting the LGBTI community from targeted violence. The Salvadoran Attorney General told CNN *en Español* that his office recently launched "several investigations" into crimes against LGBTI persons but "did not specify an exact number of cases." AR403-04. His office acknowledged that the responsible parties have not yet been found and that the success of these investigations depends on the cooperation of other institutions such as the National Civil Police. While there are contradictory reports as to whether Salvadoran law distinguishes between random crimes and crimes motivated by a victim's sexual orientation, one theme seems consistent throughout the record: whatever laws exist to protect LGBTI persons are not enforced. These are but a few snippets of the favorable evidence that the IJ and the BIA ignored or failed to address. It is simply not true that Melgar did "not submit[] any evidence" showing government acquiescence. AR4. Again, if the BIA intended to disregard or reject this evidence, we need to know why to perform a meaningful review of its decision. *See Fei Yan Zhu*, 744 F.3d at 272.

Lastly, to decide whether Melgar is more likely than not to be tortured, the IJ should have ascertained factually "what is likely to happen to [Melgar] if removed," and then determine whether what is likely to happen "amount[s] to the legal definition of torture." *Dutton-Myrie*, 855 F.3d at 516 (quoting *Kaplun v. Att'y Gen. U.S.*, 602 F.3d 260, 271 (3d Cir. 2010)). Even though the IJ did not make these findings, the BIA

19

independently concluded that Melgar's claim was too "speculative" to meet the "more likely than not" standard, without elaborating as to why. AR4. When determining likelihood of future torture, the BIA must consider evidence of past torture, the possibility of relocation, evidence of mass human rights violations, and relevant country conditions. *Pieschacon-Villegas v. Att'y Gen. U.S.,* 671 F.3d 303, 313 (3d Cir. 2011). A failure to perform that task is error. *Id.* at 314. We remind the BIA that its role is to *review* "[f]acts determined by the immigration judge," not make factual findings in the first instance. *Alimbaev v. Att'y Gen. U.S.*, 872 F.3d 188, 196 (3d Cir. 2017) (quoting 8 C.F.R. § 1003.1(d)(3)(i)). "If further factfinding is needed, the [BIA] must remand the proceeding to an immigration judge." *Id*.

In short, on remand, the BIA must also reconsider Melgar's CAT claim.

## V. CONCLUSION

For these reasons, we will vacate the BIA's decision and remand for further proceedings consistent with this opinion.