**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3750
_____

NELSON QUINTEROS,
Petitioner

v.

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA,
Respondent

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A079-029-001)
Immigration Judge:  John P. Ellington

Argued on September 24, 2019

Before:  MCKEE, AMBRO and ROTH, <u>Circuit Judges</u>

(Opinion filed: December 17, 2019)

Damon C. Andrews          (**ARGUED**)
Kirkland & Ellis
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004

Alexa M. Siegel
P.O. Box 65
Baldwin, MD 21013

Nathanael P. Kibler
Baker Donelson Bearman Caldwell & Berkowitz
265 Brookview Centre Way
Suite 600
Knoxville, TN 37828


               Counsel for Petitioner


Rachel L. Browning
Virginia M. Lum, Esq.     (**ARGUED**)
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044


               Counsel for Respondent

O P I N I O N

**ROTH**, Circuit Judge:

This is a petition for review of a final order of removal. The Board of Immigration Appeals found that Nelson Quinteros committed an aggravated felony and failed to show entitlement to relief under the Convention Against Torture (CAT). Quinteros argues that the Board committed two errors: First, the Board erred in finding that his conviction for conspiracy to commit assault with a dangerous weapon was an aggravated felony under the Immigration and Nationality Act (INA); second, the Board erred in applying our precedent on the Convention Against Torture. For the reasons that follow, we will vacate the Board's decision and remand for further proceedings consistent with this opinion.

**I.**

Nelson Quinteros and his mother came to the United States from El Salvador in 2001, when he was eight-years-old. They settled in New York. When he was thirteen, Quinteros joined the gang MS-13. He has a New York Yankees tattoo that he asserts symbolizes that his particular gang is based in New York.

In 2011, Quinteros was indicted for conspiracy to commit assault with a dangerous weapon under 18 U.S.C. § 1959(a)(6). Quinteros and other gang members discussed over the phone that they would assault members of Surenos, a rival gang. Quinteros drove other gang members to a Surenos location, but the Surenos "backed down."[1]  No assault took

---

[1] AR 1057–58.

3

place.  Quinteros later pled guilty to conspiracy to commit assault with a dangerous weapon.  He was sentenced to thirty months' imprisonment.

In prison, Quinteros left MS-13 to follow Christianity.  When he told other MS-13 members in prison that he was no longer in the gang, they would reply with statements like, "Well, when you get deported and you go back to El Salvador, things are going to change.  There's no getting out over there."[2]

When Quinteros's sentence ended, the Department of Homeland Security (DHS) initiated removal proceedings.  DHS placed Quinteros in expedited proceedings after it determined that Quinteros had been convicted of an aggravated felony under the Immigration and Nationality Act (INA).  In 2014, Quinteros was issued a Form I-851 Notice of Intent to Issue a Final Administrative Removal Order.  The Form I-851 charged Quinteros as removable for having committed an aggravated felony under 8 U.S.C. § 1101(a)(43)(F), (U), and (J) and allowed Quinteros to contest his removability.  He checked the box to contest his deportability and indicated he would attach documents supporting his request.  He failed to follow up with additional documentation.

Quinteros then sought withholding of removal.  An asylum officer determined that Quinteros demonstrated a reasonable fear that he would be tortured in El Salvador.  The officer referred Quinteros to an Immigration Judge (IJ).

Before the IJ, Quinteros attempted to show that he would be tortured in El Salvador.  He also sought to show that

---

[2] *Id.* at 560 l. 20–21.

the police would, at the very least, be unlikely to protect him and, at worst, would directly perpetrate violence against him. Quinteros testified on his own behalf and presented the testimony of Dr. Thomas Boerman, a country conditions expert. Quinteros also relied on several studies and reports. Most relevant for this appeal, Quinteros submitted a study from the Harvard Law School International Human Rights Clinic (Harvard study) that discussed the perception and treatment of individuals with tattoos in El Salvador.

A. Quinteros's Testimony

Quinteros gave several reasons why he would be recognizable as a gang member in El Salvador. He "anticipate[d] that he would be readily identified as a deportee because of his distinct accent and his 'NY Yankees' tattoo."[3] He testified that he knows seventy other gang members, who have been deported to El Salvador, and has cousins in MS-13.

Quinteros also offered anecdotal evidence that other former gang members, deported to El Salvador, had been harassed or killed. Quinteros did not believe that the police would protect him. He testified that other MS-13 members in New York had sent money to the police in El Salvador to secure protection for the gang there. He thought that the police would not get involved in gang-on-gang violence because the police would have little to gain.

B. Dr. Boerman's Testimony

Dr. Boerman testified as an expert on conditions in El

---

[3] *Id.* at 461.

Salvador and corroborated much of Quinteros's testimony. He detailed several iterations of largely ineffectual Salvadoran government policies to combat gang violence. First, he described a set of 2003 laws that criminalized gang membership, resulting in the arrest of 20,000 people. Ultimately, however, few people were charged for gang offenses. These laws remain on the books, but at the time of Dr. Boerman's testimony in 2015, he testified that most arrests of suspected gang members resulted in a short period of detention and no charges. When charges are filed, gang members are usually acquitted "because of the effect of witness intimidation, terrorization, and murder."[4]

Then came a gang truce from 2012 to 2014 that appeared to have decreased homicides. But this truce was discredited after authorities discovered a substantial "increase in the use of clandestine cemeteries."[5] Some researchers believe that the supposed truce actually strengthened the gangs and increased violence.

In 2014, a new president attempted to implement a new anti-gang policy. That plan also stalled. Although the government has labeled the gangs, including MS-13, "terrorist groups,"[6] and has authorized the use of El Salvador's anti-terrorism laws to combat them, it is not clear whether the government has implemented these laws.

Dr. Boerman also described a "'disconnect' between

---

[4] *Id.* at 674.

[5] *Id.* at 666.

[6] *Id.* at 670.

official policy and actual practice."[7]  For example, although trained on human rights, some "officers have sought permission to form groups that carry out assassinations as an official state function."[8]  According to Dr. Boerman, the Salvadoran government no longer investigates police killings of gang members.

Dr. Boerman detailed a special risk of harm for former gang members.  When the U.S. deports an individual, it provides the country to which the deportee is returning with the deportee's gang affiliation and information about his tattoos. Dr. Boerman provided anecdotal evidence that immigration officers, police, and military in El Salvador have subjected suspected gang members to physical violence during the customs process.  Gang members and police easily identify newcomers to a community and take great pains to determine their background, including stripping them down to check for tattoos.  Dr. Boerman also stated that a New York Yankees tattoo is "commonly recognized as gang affiliated from the United States, in the east coast."[9]  The police or a gang would interpret that tattoo "as gang related."[10]  Efforts to remove the tattoo would result in scarring that would likewise raise suspicions of gang affiliation.

C. Agency Proceedings

After conducting hearings, the IJ denied Quinteros's

---

[7] *Id.* at 466.
[8] *Id.*
[9] *Id.* at 683.
[10] *Id.* at 683–84.

7

request for relief under the Convention Against Torture (CAT). The IJ found that Quinteros "ha[d] shown a clear likelihood that he would be killed or tortured by members of MS-13 and [rival] gangs"[11] but had not shown that the Salvadoran police would be willfully blind to that torture. The IJ found that the "escalating violence" in El Salvador, although "alarming," was "stemming from war-like conditions" and did "not necessarily mean that the government is abdicating its responsibility to protect the public."[12]

The IJ also determined that Quinteros's crime was an aggravated felony. The IJ applied the modified categorical approach and found that Quinteros's crime was a crime of violence, as defined in 18 U.S.C. § 16(b), and that conspiracy did not require an overt act.[13]

Quinteros appealed the IJ's CAT findings, making no mention of the aggravated felony finding. The BIA affirmed. Quinteros appealed. We granted the government's request to remand, in light of our decision in *Myrie v. Attorney General*,[14] in order to determine if the Salvadoran government, more likely than not, would acquiesce in Quinteros's torture by gang members

On remand, both Quinteros and the government offered

---

[11] *Id.* at 477.

[12] *Id.* at 479.

[13] A crime of violence is an aggravated felony under 8 U.S.C. § 1101(a)(43)(F), and a conspiracy to commit a crime of violence is an aggravated felony under 8 U.S.C. § 1101(a)(43)(U).

[14] 855 F.3d 509 (3d Cir. 2017).

additional, updated evidence on conditions in El Salvador. Because the effect of Quinteros's evidence was essentially the same, the second IJ adopted the first IJ's finding that Quinteros had shown a likelihood of being killed or tortured by gangs and similarly found that the Salvadoran officials' likely response would not constitute acquiescence. The IJ noted that he had reviewed Quinteros's prior and current testimony, Dr. Boerman's prior testimony and written declaration, and all other supporting materials in conjunction with United States Department of State country condition reports.[15] The IJ rested his findings on the new efforts El Salvador was taking to combat gang violence and the lack of evidence that a Yankees tattoo was a gang symbol.

Quinteros appealed to the Board. While his appeal was pending, the Supreme Court in *Sessions v. Dimaya*[16] invalidated 18 U.S.C. § 16(b), as unconstitutionally vague. Quinteros moved to remand based on *Dimaya*. The Board then determined that, because Quinteros was in expedited removal proceedings, he could not challenge his status as an aggravated felon.[17] In a footnote, the Board noted that Quinteros was subject to expedited removal proceedings because he committed an aggravated felony under 8 U.S.C. § 1101(a)(43)(F), (U), and (J).[18] To accept such logic would

---

[15] AR 130.

[16] 138 S.Ct. 1204 (2018).

[17] AR 8.

[18] Section 1101(a)(43)(J) classifies certain racketeering offenses as aggravated felonies. Although the DHS Notice of Intent listed subsections (F), (U), and (J) as the basis for its aggravated felony finding, the first IJ found Quinteros removable only under (F) and (U).

render it impossible for anyone in such a situation to challenge their status before the BIA.

The Board affirmed the denial of Quinteros's CAT claim. In doing so, the Board reversed the IJ's finding on the likelihood of torture as clearly erroneous, questioning whether Quinteros would even be recognized as a current or former gang member. The Board also noted that Quinteros had not shown that his tattoo was visible or that it would signify to others that he was a current or former gang member. The Board agreed with the IJ that Quinteros failed to show acquiescence by state actors, noting the new "extraordinary measures" El Salvador was taking "to combat gang violence."[19]

Quinteros petitioned this Court for review of the finding that his conviction is an aggravated felony and, in light of *Dimaya*, of the Board's denial of his motion to remand. Quinteros also alleges that the Board committed legal error in denying CAT relief.

## II.

We have jurisdiction over final orders of removal under 8 U.S.C. § 1252(a)(1). The government argues that where, as here, the agency has found that an alien committed an aggravated felony, we have no jurisdiction under 8 U.S.C. § 1252(a)(2)(C) to review the removal order. Nevertheless, we retain jurisdiction over "constitutional claims or questions of

---

[19] AR 6.

10

law."[20]  If "the BIA issues a decision on the merits and not simply a summary affirmance, we review the BIA's, and not the IJ's, decision."[21]  We also review those portions of the IJ decision that the Board adopts or defers to.[22]

## III.

A. This Court has jurisdiction to consider whether Quinteros was convicted of an aggravated felony.

The first question we must answer is whether we have jurisdiction to hear Quinteros's challenge to the aggravated felony finding.  The government argues that Quinteros failed to exhaust his administrative remedies because he did not challenge the aggravated felony finding in response to the initial notice of intent to issue a final administrative removal order.  Quinteros argues that he did all that was required:  He checked the box on the BIA form that indicated he disagreed with the finding of removability.[23]  Although generally an alien

---

[20] 8 U.S.C. § 1252(a)(2)(C), (D).

[21] *Chavarria v. Gonzalez*, 446 F.3d 508, 515 (3d Cir. 2006).

[22] *Id.  See also Voci v. Gonzales*, 409 F.3d 607, 612 (3d Cir. 2005).

[23] The parties' arguments highlight a circuit split over what an alien must do on appeal to have properly preserved a challenge to DHS's aggravated felony finding.  The Eleventh Circuit held that failure to contest one's classification as an aggravated felon in response to a final administrative removal order deprives the reviewing court of jurisdiction because the alien has not exhausted administrative remedies.  *Malu v. United States Att'y Gen.*, 764 F.3d 1282, 1289 (11th Cir. 2014).  The

is required to exhaust his administrative remedies—a jurisdictional requirement[24]—an agency revives an alien's unexhausted claim when it *sua sponte* considers an issue.[25] Here, the first IJ *sua sponte* determined that Quinteros's conviction was for an aggravated felony under § 1101(a)(43)(F) and (U).

Although Quinteros did not challenge on appeal the IJ's aggravated felony finding, he did file a motion to remand to the IJ, challenging his removability as an aggravated felon. The Board considered this motion to remand and concluded that Quinteros could not challenge the aggravated felon determination in expedited removal proceedings. Because the Board had the opportunity to consider Quinteros's challenge to his removability as an aggravated felon and declined to do so

---

Fourth Circuit held that an alien in expedited removal proceedings can raise only factual challenges in administrative proceedings and so the reviewing court has jurisdiction over legal challenges to removability "in the first instance on appeal." *Etienne v. Lynch*, 813 F.3d 135, 138 (4th Cir. 2015). The Fifth and Seventh Circuits have held similarly. *Valdiviez-Hernandez v. Holder*, 739 F.3d 184, 187 (5th Cir. 2013); *Victoria-Faustino v. Sessions*, 865 F.3d 869, 873 (7th Cir. 2017). We need not wade into this circuit split because here, the agency took up Quinteros's challenge *sua sponte*.

[24] *Popal v. Gonzales*, 416 F.3d 249, 252 (3d Cir. 2005). A court cannot hear a claim unless "an alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1).

[25] *Lin v. Att'y Gen. of United States*, 543 F.3d 114, 123–25 (3d Cir. 2008).

on the merits, the aggravated felony issue is exhausted for purposes of appeal.[26]

Moreover, we always retain jurisdiction to determine our own jurisdiction.[27] As we have said before, this principle extends to "jurisdiction to address [the] jurisdictional prerequisite . . . of . . . 'whether an alien was convicted of a non-reviewable aggravated felony.'"[28] We will therefore first determine whether Quinteros was convicted of an aggravated felony. Our review of this issue is "de novo as it implicates a purely legal question."[29]

B. Quinteros did not commit an aggravated felony.

DHS charged Quinteros as deportable for being convicted of an aggravated felony under 2 U.S.C. 1101(a)(43)(F), (J), and (U). Subsection (F) applies to a crime of violence using the definition in 18 U.S.C. § 16.[30] Subsection

---

[26] We have previously found jurisdiction where a party includes an issue in the Notice of Appeal to the BIA but fails to include the issue in the brief to the BIA and the BIA does not address the issue. *See Hoxha v. Holder*, 559 F.3d 157, 158, 161 (3d Cir. 2009).

[27] *Restrepo v. Att'y Gen. of United States*, 617 F.3d 787, 790 (3d Cir. 2010) (quoting *Stubbs v. Att'y Gen.*, 452 F.3d 251, 253 n.4 (3d Cir. 2006)).

[28] *Restrepo*, 617 F.3d at 790.

[29] *Id.*

[30] Section 16 defines crime of violence as: "(a) on offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b)

13

(J) applies to several racketeering offenses.  Subsection (U) applies to an "attempt or conspiracy to commit" an aggravated felony.

When determining whether a particular offense is an aggravated felony, we apply the categorical approach.[31]  Under the strict categorical approach, we compare the state statute of conviction with "the federal statute enumerating categories of crimes" without regard to "the underlying facts."[32]  In applying the categorical approach, we are to "presume that the conviction 'rested upon [nothing] more than the least of th[e] acts' criminalized, and then determine whether even those acts are encompassed by the generic federal offense."[33]

Quinteros was convicted under 18 U.S.C. § 1959(a)(6).  That section states:

> (a) Whoever, as consideration for the
>     receipt of, or as consideration for a
>     promise   or   agreement   to   pay,

---

any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

[31] *See Moncrieffe v. Holder*, 569 U.S. 184, 188 (2013); *United States v. Dahl*, 833 F.3d 345, 349 (3d Cir. 2016) (discussing categorical approach as applying to both federal and state convictions).

[32] *Singh v. Ashcroft*, 383 F.3d 144, 161 (3d Cir. 2004).

[33] *Moncrieffe*, 569 U.S. at 191 (2013) (quoting *Johnson v. United States*, 559 U.S. 133, 137 (2010)) (alterations in original).

14

anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—

. . .

(6) for attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury . . . ."[34]

Because Quinteros's statute of conviction is "an alternatively phrased statute," we must first "determine whether its listed items are elements or means."[35] If the alternatives are elements, some of which would qualify as an aggravated felony and some of which would not, then the modified categorical approach applies, and we can look to

---

[34] 18 U.S.C. § 1959(a)(6).

[35] *Mathis v. United States*, 136 S.Ct. 2243, 2256 (2016).

15

documents, related to the crime as committed, to determine "which of the enumerated alternatives played a part in the [petitioner's] prior conviction, and then compare that element (along with all others) to those of the generic crime."[36]

1. *Quinteros's conviction was not a crime of violence under § 1101(a)(43)(F).*

Section 1101(a)(43)(F) employs the crime of violence definition from 18 U.S.C. § 16. The first IJ found that § 1959(a)(6) constituted a crime of violence as defined in § 16(b). Because the Supreme Court found that § 16(b) was unconstitutionally vague, the IJ's aggravated felony finding based on § 16(b) cannot stand.[37]

Neither could Quinteros's conviction be a crime of violence under § 16(a), a ground the first IJ did not consider. Section 16(a) defines a crime of violence as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another."[38] Looking at the least culpable conduct, an individual could be convicted of conspiracy under 18 U.S.C. § 1959(a)(6) without the use, attempted use, or threatened use of physical force.

---

[36] *Id.*

[37] Because we hold that the IJ's aggravated felony finding under § 16(b) was in error after *Sessions v. Dimaya*, 138 S.Ct. 1204, we need not address whether the Board's denial of Quinteros's motion to remand was error.

[38] 18 U.S.C. § 16(a).

16

*2. Quinteros's conviction was not a conspiracy or attempt to commit a crime of violence under § 1101(a)(43)(U).*

Next, we determine if Quinteros was convicted of an aggravated felony under § 1101(a)(43)(U) for "an attempt or conspiracy to commit" a crime of violence.[39]  Using the categorical approach, we compare the statute of conviction, § 1959(a)(6), with generic conspiracy as used in the INA, § 1101(a)(43)(U).  A conviction under § 1959(a)(6) does not require an overt act in furtherance of the conspiracy.[40]  We must determine whether the INA's generic definition of conspiracy requires an overt act.  We hold that it does.

---

[39] 8 U.S.C. § 1101(a)(43)(U).

[40] Generally, where the statutory text "does not expressly make the commission of an overt act an element of the conspiracy offense, the government need not prove an overt act to obtain a conviction."  *Whitfield v. United States*, 543 U.S. 209, 214 (2005).  *See also United States v. Salahuddin*, 765 F.3d 329, 339 (3d Cir. 2014) (declining to find an overt act requirement for Hobbs Act conspiracy where the statute "makes no mention of a required act").  Other Circuits examining § 1959(a)(6), or similar subsections, have generally not required an overt act.  *See, e.g.*, *United States v. McCollum*, 885 F.3d 300, 309 (4th Cir. 2018) (finding that 18 U.S.C. § 1959(a)(5) does not require an overt act); *United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999) (finding no overt act required for § 1959(a)(6)).  Only in an unpublished Ninth Circuit opinion did a panel note that the jury had to be unanimous on an overt act for a conviction under § 1959(a)(6).  *See United States v. Franco*, 745 F. App'x 285, 287 (9th Cir. 2018).

17

The government argues that the BIA's interpretation of § 1101(a)(43)(U) is entitled to deference.[41] Generally, *Chevron* principles apply "to an agency's consistent interpretation of the statute it administers,"[42] including the INA.[43] "[T]he issue of *Chevron* deference to the BIA's evaluation of criminal statutes in light of the INA has generated some controversy and confusion."[44] We defer to the agency's reasonable interpretation of a statute only if the text of the statute is "unclear" and we cannot "discern congressional intent by utilizing various tools of statutory construction."[45] We find no reason to defer to the BIA here because the meaning of "conspiracy" in § 1101(a)(43)(U) of the INA is unambiguous when employing the ordinary tools of statutory construction.

---

[41] The government relies primarily on *Matter of Richardson*, 25 I&N Dec. 226 (BIA 2010).

[42] *Matter of Seidman*, 37 F.3d 911, 924 (3d Cir. 1994).

[43] *See Drakes v. Zimski*, 240 F.3d 246, 250 (3d Cir. 2001). "[U]npublished, single-member BIA decisions are not entitled to *Chevron* deference." *Mahn v. Att'y Gen. of United States*, 767 F.3d 170, 173 (3d Cir. 2014). But, here, the IJ relied on *Matter of Richardson*, 25 I&N Dec. 226 (BIA 2010), a published decision of a panel of the Board that held that conspiracy under § 1101(a)(43)(U) does not require an overt act.

[44] *Lewin v. Att'y Gen. of United States*, 885 F.3d 165, 169 (3d Cir. 2018). At least once, we unhesitatingly applied *Chevron* and deferred to the BIA's reasonable interpretation of the INA. *Restrepo*, 617 F.3d at 796.

[45] *Restrepo*, 617 F.3d at 792.

18

Where Congress has not specifically defined a word in a statute, we presume the common law definition applies.[46] But the presumption that a term be given its common-law meaning does not apply when the common law "meaning is obsolete or inconsistent with the statute's purpose."[47] In those instances, the approach taken "in the criminal codes of most states" replaces the common law definition.[48] We have stated before that, when determining the elements of the generic crime, we look to "the Model Penal Code (MPC), state laws, and learned treatises."[49] But "the most important factor in defining the generic version of an offense is the approach of the majority of state statutes defining the crime."[50] We therefore contrast the common law definition of conspiracy with the majority of states' definition of conspiracy and hold that conspiracy in § 1101(a)(43)(U) requires an overt act.

At common law, the crime of conspiracy was complete

---

[46] *See Taylor v. United States*, 495 U.S. 575, 592 (1990) (citing *Morissette v. United States*, 342 U.S. 246, 263 (1952)).

[47] *Taylor*, 495 U.S. at 594.

[48] *Id.* at 598. The Supreme Court in *Taylor* applied this approach to interpreting 18 U.S.C. § 924(e) for purposes of sentencing enhancement. Later, the Supreme Court applied this same principle to interpreting "theft offense" under the INA. *See Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 190 (2007).

[49] *United States v. Graves*, 877 F.3d 494, 502 (3d Cir. 2017) (interpreting the career offender provisions of the Sentencing Guidelines).

[50] *Id.* at 504.

19

upon the making of an agreement.[51]  But now, the large majority of states also require an overt act.[52]  So does the MPC.[53]  Although some courts have continued to apply the common law definition,[54] the meaning of conspiracy has changed.  The overt act requirement was an attempt to rein in expansive conspiracy liability,[55] "guarding against the punishment of evil intent alone, and . . . assur[ing] that a criminal agreement actually existed."[56]  We think this change significant and apply the modern overt act requirement reflected in the statutes of a majority of states and the MPC.  Because Quinteros's conviction under 18 U.S.C. § 1959(a)(6) does not require an overt act, his conviction is not a categorical match for conspiracy under the INA.  Thus he is not an aggravated felon under Subsection U.

### 3. *Quinteros's conviction was not a racketeering offense under § 1101(a)(43)(J).*

The government has argued that we need not reach the

---

[51] *United States v. Shabani*, 513 U.S. 10, 13–14 (1994) (quoting *Nash v. United States*, 229 U.S. 373, 378 (1913)).

[52] *United States v. Garcia-Santana*, 774 F.3d 528, 534–35 (9th Cir. 2014) ("A survey of state conspiracy statutes reveals that the vast majority demand an overt act to sustain conviction.").

[53] *See* Model Penal Code § 5.03(5) (Am. Law Inst. 1985) (requiring overt acts for all crimes "other than a felony of the first or second degree").

[54] *Etienne*, 813 F.3d at 145.

[55] *Garcia-Santana*, 774 F.3d at 536–37.

[56] *Id.* at 537.

question of whether Quinteros was convicted of an aggravated felony for purposes of § 1101(a)(43)(J). The Board noted in a footnote, without explaining its reasoning, that Quinteros's conviction was an aggravated felony under § 1101(a)(43)(J). Although DHS had included this charge in the Form I-851, this was not a ground that either the IJ or the BIA had previously addressed in the proceedings. Generally, "[w]hen deficiencies in the BIA's decision make it impossible for us to meaningfully review its decision, we must vacate that decision and remand so that the BIA can further explain its reasoning."[57] But where, as here, the BIA has failed to conduct the categorical approach and the BIA's application of the categorical approach would not be accorded deference, we have considered the question *de novo*.[58] So too here.

Quinteros's conviction for conspiracy to commit assault with a dangerous weapon is not an aggravated felony as defined in § 1101(a)(43)(J). Subsection J makes an aggravated felony any offense described in 18 U.S.C. §§ 1084, 1955, or 1962. Sections 1084 and 1955 deal only with gambling-related offenses—for which Quinteros's conviction cannot be a categorical match. This leaves offenses described in 18 U.S.C. § 1962, which fall under the general category of racketeering offenses. Although Quinteros's statute of conviction for conspiracy to commit assault with a dangerous weapon bears the title of "violent crimes in aid of racketeering activity," §

---

[57] *Kayembe v. Ashcroft*, 334 F.3d 231, 238 (3d Cir. 2003). *See also Cruz v. Att'y Gen. of United States*, 452 F.3d 240, 249 (3d Cir. 2006) ("Where a BIA opinion leaves the scope of our jurisdiction in question, we will remand the case to the BIA for further consideration.").

[58] *See Singh v. Ashcroft*, 383 F.3d 144 at 152.

1959(a)(6) has little in common with the offenses in § 1962.

Section 1962 has four subsections. Subsection (a) relates to receiving and investing money from a racketeering enterprise. Quinteros's conviction does not have as an element the investing of money. Subsections (b) and (c) require "a pattern of racketeering activity or collection of unlawful debt."[59] Racketeering activity is defined as "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical"[60] or any of a number of offenses defined in other statutes—of which § 1959 is not one. Nor does Quinteros's conviction under § 1959(a)(6) have as an element conduct that would meet the more general descriptions of racketeering activity. Lastly, subsection (d) criminalizes a conspiracy to violate the foregoing provisions of § 1962, but because Quinteros's conviction does not meet the requirements of subsections (a) through (c), he likewise could not have been convicted under § 1962(d). Thus, Quinteros's conviction is not a categorical match for any of the statutory offenses listed in § 1101(a)(43)(J) and is not an aggravated felony.

C. The BIA erred in its CAT finding.

Having determined that Quinteros did not commit an aggravated felony, we will remand this case to the Board. However, before remanding, we need to discuss the standard to be applied by the Board in determining state acquiescence.

---

[59] 18 U.S.C. § 1962(b), (c).
[60] 18 U.S.C. § 1961(1).

Quinteros argues that the Board erred in applying the standard we enunciated in *Myrie*[61] because the Board failed to make the required findings and applied the wrong legal standard for state acquiescence. Quinteros's argument that the Board applied the wrong legal standard for acquiescence is a legal challenge that we review *de novo*,[62] as is our review of the sufficiency of the Board's findings under the standard we enunciated in *Myrie*.[63]

Quinteros also argues that the Board erred by ignoring evidence relevant to the *Myrie* analysis. Generally, an agency is required to consider "all evidence relevant to the possibility of future torture,"[64] but "the IJ and BIA need not 'discuss every piece of evidence mentioned by an asylum applicant.'"[65] Although it is usually sufficient to say, as the IJ did here, that "[a]ll evidence and testimony has been considered, even if not specifically addressed in the decision below,"[66] the agency "may not ignore evidence favorable to the alien."[67] And "[i]f [evidence] is to be disregarded, we need to know why."[68] We will examine whether the IJ ignored evidence under each prong

---

[61] 855 F.3d 509.

[62] *Pieschacon-Villegas v. Att'y Gen. of United States*, 671 F.3d 303 (3d Cir. 2011).

[63] *See Green v. Att'y Gen. of United States*, 694 F.3d 503 (3d Cir. 2012).

[64] *Green*, 694 F.3d at 508 (quoting 8 C.F.R. § 1208.16(c)(3)).

[65] *Green*, 694 F.3d at 509 (quoting *Huang v. Att'y Gen. of the United States*, 620 F.3d 372, 388 (3d Cir. 2010)).

[66] AR 127. *See Green*, 694 F.3d at 509.

[67] *Huang*, 620 F.3d at 388 (citing *Espinosa-Cortez v. Att'y Gen.*, 607 F.3d 101, 107 (3d Cir. 2010)).

[68] *Myrie*, 855 F.3d at 518.

of *Myrie*.

*Myrie* set forth two prongs that the Board must answer when evaluating a CAT claim. First, the agency must determine "whether an applicant has met the burden of establishing that it is more likely than not [the alien] would be tortured if removed."[69] Second, the agency asks whether public officials will acquiesce in the likely treatment.[70] We will examine the errors under each prong of *Myrie* in turn.

### 1. Errors under Myrie Prong 1

Quinteros argues that the Board failed to determine what would likely happen to him upon his return to El Salvador and whether what would likely happen would constitute torture. Under prong one, the agency determines whether an alien would likely be "tortured if removed."[71] Answering that question requires two steps: (1) the agency must examine "what is likely to happen to the petitioner if removed" and (2) the agency must decide whether "what is likely to happen amount[s] to the legal definition of torture."[72]

---

[69] *Myrie*, 855 F.3d at 516.

[70] *Id.*

[71] *Myrie*, 855 F.3d at 516.

[72] *Id.* "For an act to constitute torture under the [CAT] and the implementing regulations, it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions." *Auguste v. Ridge*, 395

24

Quinteros argues that the Board erred in ignoring numerous pieces of evidence in evaluating his CAT claim. In reversing the IJ's finding that Quinteros would likely be tortured or killed in El Salvador, the Board made three findings. First, the Board concluded that Quinteros had not shown that he was likely to "be identified either as a current or former gang member."[73] Second, the Board found that his tattoo was not likely to be discovered because it can be covered while in public. And third, the Board concluded that there was insufficient evidence that a New York Yankees tattoo was a recognized gang symbol.

The Board erred in ignoring evidence about Quinteros's tattoo. The Board concluded that gang members would not be able to identify Quinteros based on his tattoo because his tattoo could be covered by clothing. But the Board made no mention of the practice that Quinteros, Dr. Boerman, and the Harvard study discussed: Police and gangs force suspected gang members to strip down so they can search them for tattoos. The Board also erred in ignoring evidence about the significance of Quinteros's tattoo. The Board stated that Quinteros had not introduced evidence "[a]part from his own testimony and the testimony of his expert witness" regarding the significance of his New York Yankees tattoo.[74] Yet the Harvard study spoke at length about the significance of tattoos.[75] That is grounds

---

F.3d 123, 151 (3d Cir. 2005) (citing *Matter of J–E–*, 23 I. & N. Dec. 291, 297 (BIA 2002)).

[73] AR 5.

[74] AR 6.

[75] Although the Harvard study did not address the significance of a New York Yankees tattoo specifically, it discussed the

for a remand.[76]

Quinteros's argument that the Board failed to determine what would likely happen to him upon return to El Salvador and whether that would constitute torture is not quite as clear-cut.  Quinteros's theory of why he would be harmed upon returning to El Salvador was premised on state and nonstate actors recognizing his gang affiliation and acting, or failing to act, based on it.  But even though the Board found that others were not likely to recognize Quinteros as a gang member, the Board was required to determine whether what was "likely to happen" would constitute torture.[77]  Because, however, the Board failed to consider evidence that would have undermined its conclusion that Quinteros was unlikely to be recognized as a gang member, the Board must conduct its *Myrie* analysis anew.

## 2. *Errors under Myrie Prong 2*

Quinteros also argues that neither the Board nor the IJ made any factual findings as to how public officials would

---

significance of tattoos generally, including that "individuals with tattoos, gang-related or not, often fear being targeted for arbitrary arrests and detentions in El Salvador."  AR 1265.

[76] *See Green*, 694 F.3d at 508–09.

[77] *See Myrie*, 855 F.3d at 516 (quoting *Kaplun v. Att'y Gen.*, 602 F.3d at 271) (noting that when the IJ makes a determination under the first prong of *Myrie*, "the IJ must address two questions: "(1) what is likely to happen to the petitioner if removed; and (2) does what is likely to happen amount to the legal definition of torture?").

likely respond and that the Board and IJ applied the wrong legal standard for acquiescence. In determining whether public officials will acquiesce to torture, *Myrie* requires an analysis of "how public officials will likely act in response to the harm the petitioner fears" and "whether the likely response from public officials qualifies as acquiescence."[78]

The Board primarily adopted the IJ's reasoning as to how public officials would likely respond. The IJ discussed Quinteros's testimony that the police are corrupt and infiltrated by gangs and that Quinteros believed that his tattoo would be taken as a gang signal. The Board and IJ discussed some positive steps the Salvadoran government was taking to combat gang violence. But neither the IJ nor the Board came to a decision about how public officials would likely respond to the treatment that Quinteros feared. That requires a remand.

Quinteros also claims that the Board and IJ applied the wrong legal standard for acquiescence because they focused on the government's *efforts* rather than the *results* of those efforts. The IJ determined that the Salvadoran government would not acquiesce in Quinteros's torture because of the government had increased its efforts to address gang violence and reduce corruption in the police force. Although the IJ noted the uncertainty as to the success of these efforts, the IJ nevertheless found that these increased efforts showed that the government would not acquiesce in Quinteros's torture. The Board adopted this reasoning and again emphasized the Salvadoran government's positive efforts. We have previously made clear to the BIA that a government can acquiesce in torture despite

---

[78] *Myrie*, 855 F.3d at 516.

27

opposing the group inflicting the harm.[79]  Indeed, although "not dispositive of" whether a government acquiesced in torture through willful blindness, "an applicant may be able to establish governmental acquiescence in some circumstances, even where the government is unable to protect its citizens from persecution."[80]  The Board was required to consider whether the government of El Salvador is capable of preventing the harm Quinteros would likely face.

## IV.

Having concluded that Quinteros's conviction under 18 U.S.C. § 1959(a)(6) is not an aggravated felony under 8 U.S.C. § 1101(a)(43)(F), (U), or (J), Quinteros is not removable as charged.  We therefore grant Quinteros's petition for review and vacate the Board's final removal order,[81] and remand this case to the Board for further proceedings consistent with this opinion.

---

[79] *See, e.g.*, *Pieschacon-Villegas*, 671 F.3d at 312 ("[A]n applicant can establish governmental acquiescence even if the government opposes the paramilitary organization that is engaged in torturous acts."); *Gomez-Zuluaga v. Att'y Gen. of United States*, 527 F.3d 330, 351 (3d Cir. 2008) ("The mere fact that the Colombian government is engaged in a protracted civil war with the FARC does not necessarily mean that it cannot remain willfully blind to the torturous acts of the FARC.").

[80] *Pieschacon-Villegas*, 671 F.3d at 311.

[81] *See, e.g.*, *Borrome v. Att'y Gen.*, 687 F.3d 150, 163 (3d Cir. 2012) (holding that the petitioner was not convicted of an aggravated felony and vacating the removal order).

McKEE, *Circuit Judge*, with whom Judges Ambro and Roth join, concurring.

I join my colleagues' thoughtful opinion in its entirety. I write separately because I think it is as necessary as it is important to emphasize the manner in which the BIA dismissed Quinteros' claim that he would be tortured (and perhaps killed) if sent back to El Salvador. For reasons I will explain below, it is difficult for me to read this record and conclude that the Board was acting as anything other than an agency focused on ensuring Quinteros' removal rather than as the neutral and fair tribunal it is expected to be. That criticism is harsh and I do not make it lightly.

The BIA's puzzling conclusions concerning Quinteros' New York Yankees tattoo, although not the sole cause of my concern, illustrate the reasons I feel compelled to write separately. I will therefore begin by discussing the BIA's decision-making process concerning this tattoo.

**I.**

As Judge Roth notes, Quinteros testified that his New York Yankees tattoo would identify him as a former gang member.[1] He also produced corroborating testimony to that effect from an expert witness and a study from the Harvard Law School International Rights Clinic. The first Immigration Judge to consider this evidence—which was apparently undisputed by the government—did so carefully and ultimately concluded that Quinteros "[h]as shown a clear likelihood that he would be killed or tortured by members of MS-13 and 18th Street gangs."[2] This finding was affirmed by the BIA upon its first review of Quinteros' case,[3] and affirmed again by the second IJ after we remanded for consideration in light of

---

[1] Maj. Op. at 4-5.

[2] JA125. The IJ also found the expert testimony convincing: "Dr. Boerman's testimony persuasively illustrates how the Respondent could be mistaken for a gang member, since most gang members have tattoos, and there is a large number of MS-13 members in El Salvador . . ." *Id.*

[3] JA130 ("We adopt and affirm the Immigration Judge's decision.").

1

*Myrie*.[4]  Thus, two IJs and a Board member had previously examined and accepted this finding.  Yet, for reasons that are not at all apparent, the BIA suddenly reversed that conclusion upon this fourth review.

In an explanation that is both baffling and dismaying, the BIA now claims: "Apart from his own testimony and the testimony of his expert witness, the record is devoid of any *objective* evidence establishing that a person with a New York Yankees tattoo without any other gang identifying marks will be identified as a . . . gang member and subjected to torture."[5] I am at a loss to understand what the BIA is referring to by requiring "objective" evidence.  The IJ whose order was being reviewed had held that Quinteros was credible, stating: "Based on a review of the totality of evidence, the Court finds that Respondent's testimony was consistent with the record and he was forthright with the Court regarding his past membership in MS-13 gang.  Thus, the Court finds Respondent credible."[6] Moreover, there was nothing to suggest that Quinteros' testimony lacked credibility regarding any aspect of his fear of MS-13 or how gang members would interpret his tattoo, and neither IJ suggested anything to the contrary.[7]

The BIA properly states the applicable standard of review of an IJ's credibility finding is "clear error,"[8] but nowhere does it suggest any basis for finding such error in either IJs' determination.  I am therefore unable to ascertain any justification for the BIA's sudden reversal after the three previous cycles of review all arrived at the opposite conclusion.  I also remain baffled by the BIA's usage of "objective evidence."  The firsthand testimony of the victim of any crime is probative evidence if it is credible[9]—the issue is

---

[4] JA14.

[5] JA5 (emphasis added).

[6] JA12.

[7] *See* JA 14 (second IJ's conclusion that Quinteros was credible); JA118 (first IJ's conclusion that Quinteros was credible); *see also* Pet. Br. 41-42.

[8] *See* BIA Opinion at JA2 (citing C.F.R. § 1003.1(d)(3)(i)).

[9] For example, in statutory rape cases, fully half of the states (including Pennsylvania, where Quinteros is being held) have abolished their rules requiring corroboration.  The victim's

2

the credibility of the witness. Once a witness's testimony is found to be credible, it cannot arbitrarily be rejected merely to achieve a particular result. Even more salient, the BIA's rejection of Quinteros' credible testimony is inconsistent with controlling precedent and the regulations governing CAT relief.[10] Those regulations state: "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."[11] Thus, it is clear that corroborative evidence may not be necessary. In this case, where the testimony of the applicant is credible and is not questioned in any way, there is no reason to need corroboration.

Accordingly, Quinteros' testimony should have been sufficient proof of any dispute about his tattoo even if he could be described as lacking objectivity. Moreover, there was nothing offered to suggest that the expert witness or the report of the Harvard Clinic was anything less than objective. It is impossible to discern from the record why the BIA refused to accept that external evidence. Moreover, given its apparent disregard for these three distinct, previously accepted pieces of evidence, I seriously doubt whether any evidence would have been capable of changing the agency's analysis. Thus, it is the BIA's own objectivity that concerns me here.

The agency's discussion of the location of Quinteros' tattoo heightens these concerns. First, the BIA expressed

account, if credible, is sufficient. *See* 18 PA. CONS. STAT. § 3106 (2018) ("The testimony of a complainant need not be corroborated in prosecutions under [Pennsylvania criminal law]. No instructions shall be given cautioning the jury to view the complainant's testimony in any other way than that in which all complainants' testimony is viewed."); Vitauts M. Gulbis, Annotation, *Modern Status of Rule Regarding Necessity for Corroboration of Victim's Testimony in Prosecution for Sexual Offense*, 31 A.L.R. 4th 120 § 4[a] (1984).

[10] *See, e.g.*, *Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 591 (3d Cir. 2011) (accepting as objective evidence the testimony of the petitioner alone); *Auguste v. Ridge*, 395 F.3d 123, 134 (3d Cir. 2005) (accepting as "objective" the "[e]vidence of past torture inflicted upon the applicant . . .").

[11] 8 C.F.R. § 208.16.

skepticism because the record does not contain a photograph of the tattoo, "or a description of its size and design."[12] It faulted Quinteros for not establishing that the tattoo is "publicly visible," and stated, "[t]he record simply indicates that he has a tattoo on his right arm."[13] Yet, the Government never contested the existence of the tattoo and, as I have explained, Quinteros' testimony about it was accepted as credible by the IJ.

Then the BIA objected that Quinteros never "clearly specified the location of his New York Yankees tattoo and his expert witness did not know its location."[14] However, two sentences later, the BIA states that "[t]he Record . . . simply indicates that he [Quinteros] has a tattoo on his right arm."[15] Therefore, not only was there never a dispute about the existence of the tattoo, there was also no dispute as to its location, and the BIA's abortive suggestions to the contrary are simply inconsistent with a fair and neutral analysis of Quinteros' claim. Finally, even if one sets that all aside, I can find no reasonable basis for the BIA to suppose that the specific design of the tattoo or testimony about its size was even necessary. Whatever its exact appearance, it was uncontested that it was a New York Yankees tattoo. And as noted by Judge Roth, the record had established that awareness of gang use of tattoos is so prevalent in El Salvador that individuals are routinely forced by police and rival gangs to remove their clothing for inspection of any tattoos that may be present.[16] It therefore pains me to conclude that the BIA simply ignored evidence in an effort to find that Quinteros' tattoo would not place him in peril as it was underneath his clothing.[17]

**II.**

---

[12] JA5.

[13] JA5.

[14] *Id.*

[15] *Id.*

[16] Maj. Op. at 22; *see also* JA61, 90-91, 162. Overlooking so obvious an inference of danger—arising from the undisputed existence of Quinteros' tattoo—contradicts our directive that "the BIA must provide an indication that it considered such evidence, and if the evidence is rejected, an explanation as to why . . ." *Zhu v. Att'y Gen.*, 744 F.3d 268, 272 (3d Cir. 2014).

[17] JA5.

4

As troubling as the mishandling of Quinteros' evidence might be standing alone, the BIA's errors here are not an isolated occurrence. There are numerous examples of its failure to apply the binding precedent of this Circuit delineating the proper procedure for evaluating CAT appeals.[18] Indeed, that framework has been mishandled, or simply absent, from several BIA opinions in the two years since we explicitly emphasized its importance in *Myrie*.[19]

As Judge Roth explains, *Myrie* instituted a two-part inquiry for evaluating whether a claim qualifies for relief under CAT. She describes the steps required and the points which must be addressed;[20] we normally accept the BIA's well-reasoned conclusions on each of these points, however,

> "[t]he BIA must substantiate its decisions. We will not accord the BIA deference where its findings and conclusions are based on inferences

---

[18] For our particular decisions on this topic, *see Myrie v. Att'y Gen.*, 855 F.3d 509 (3d Cir. 2017); *Pieschacon-Villegas v. Att'y Gen.*, 671 F.3d 303 (3d Cir. 2011).

[19] *Myrie*, 855 F.3d at 516 (requiring the BIA to follow the process we have delineated, as, "[i]n order for us to be able to give meaningful review to the BIA's decision, we must have some insight into its reasoning.") (quoting *Awolesi v. Ashcroft*, 341 F.3d 227, 232 (3d Cir. 2003)). Among the examples of BIA error, s*ee Serrano Vargas v. Att'y Gen.*, No. 17-2424, 2019 WL 5691807, at *2 (3d Cir. Nov. 4, 2019) (finding it "unclear" whether the BIA followed our precedent); *Guzman v. Att'y Gen.*, 765 F. App'x. 721 (3d Cir. 2019) (finding ultimately non-determinative an incorrect application of the *Myrie* and *Pieschacon-Villegas* standards which had been summarily affirmed by the BIA); *Zheng v. Att'y Gen.*, 759 F. App'x. 127, 130 (3d Cir. 2019) (requiring the appeals court to read between the lines of the BIA opinion to understand whether the conclusion satisfied the *Myrie* test); *Antunez v. Att'y Gen.*, 729 F. App'x. 216, 223 (3d Cir. 2018) (concluding the BIA applied the wrong standard of review under *Myrie*).

[20] Maj. Op, at 21.

5

or presumptions that are not reasonably grounded in the record."[21]

In other words, the BIA cannot act arbitrarily. We expect that it will "examine the relevant data and articulate a satisfactory explanation for its actions, including a 'rational connection between the facts found and the choice made.'"[22] Here, as already seen, the BIA's conclusions fell far short of that low bar. According deference would therefore be to compound a mistaken application of law.

The BIA's misapplication of *Myrie* here is consistent with other examples. Beginning with the first prong of *Myrie*'s first question (what will happen if a petitioner is removed to his or her country of origin), the BIA ignored evidence in the record. I have already discussed much of its tattoo analysis.[23] Similarly, the BIA simplistically concluded that because Quinteros left El Salvador when he was a boy, he would not be recognized by El Salvadorian gangs upon his return.[24] That conclusion was clearly contradicted in the record by credible and undisputed evidence that Quinteros knows "at least 70" current or former gang members in the United States who were deported to El Salvador and would recognize him there.[25] The BIA was required to at least review the evidence Quinteros offered and provide a non-arbitrary reason for rejecting it.[26]

---

[21] *Kang v. Att'y Gen.*, 611 F.3d 157, 167 (3d Cir. 2010) (quoting *Sheriff v. Att'y Gen.*, 587 F.3d 584, 589 (3d Cir. 2009)).

[22] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

[23] JA5.

[24] JA4. The BIA strangely maintains in the face of the evidence presented that "[Quinteros] has not clearly articulated exactly how anyone in El Salvador will remember or recognize him . . ." *id.*

[25] JA63-64.

[26] *Huang*, 620 F.3d at 388 ("The BIA simply failed to address any evidence that, if credited, would lend support to [Petitioner's case], and thus the decision does not reflect a consideration of the record as a whole.").

6

And the errors do not stop there. Because it had not substantively addressed the testimony offered above, the BIA was left without substantive findings on which to determine Question II of the *Myrie* framework: does what will likely happen to a petitioner amount to torture? As Judge Roth makes clear, the BIA is required to conduct both steps of the *Myrie* analysis.[27] By declining to reach clear findings of what would happen upon removal, the BIA prevented itself from then being able to determine whether those results met the legal standard for torture. The *Myrie* framework cannot be so easily evaded.

Lastly, to briefly reiterate Judge Roth's important observations regarding *Myrie*'s second prong,[28] a proper inquiry must "take[] into account our precedent that an applicant can establish governmental acquiescence even if the government opposes the [group] engaged in torturous acts."[29] This is only logical, as few countries admit to torturing and killing their citizens, even when privately condoning such conduct. Thus, if we simply took countries at their word, there would barely be anywhere on the globe where CAT could apply. We have previously made clear that this is the proper inquiry to determine acquiescence and have remanded based on the BIA's failure to look past the stated policies of a given government.[30] Other Circuit Courts of Appeals have done the same.[31] The BIA is thus on notice that results, not press

---

[27] Maj. Op, at 23 (citing *Myrie*, 855 F.3d at 516).

[28] Maj. Op, at 24-25.

[29] *Pieschacon-Villegas v. Att'y Gen.*, 671 F.3d 303, 312 (2011).

[30] *See, e.g.*, *Guerrero v. Att'y Gen.*, 672 F. App'x 188, 191 (3d Cir. 2016) (per curiam); *Torres-Escalantes v. Att'y Gen.*, 632 F. App'x 66, 69 (3d Cir. 2015) (per curiam).

[31] *Barajas-Romero v. Lynch*, 846 F.3d 351, 363 (9th Cir. 2017); *Rodriguez-Molinero v. Lynch*, 808 F.3d 1134, 1140 (7th Cir. 2015) ("[I]t is success rather than effort that bears on the likelihood of the petitioner's being killed or tortured if removed"); *Madrigal v. Holder*, 716 F.3d 499, 510 (9th Cir. 2013) ("If public officials at the state and local level in Mexico would acquiesce in any torture [petitioner] is likely to suffer, this satisfies CAT's requirement that a public official acquiesce in the torture, even if the federal government . . . would not similarly acquiesce."); *De La Rosa v. Holder*,

releases or public statements, are what drive the test for acquiescence under *Myrie*.

## III.

In Quinteros' case, as has happened before, "[t]he BIA's opinion frustrates our ability to reach any conclusion . . ."[32] In *Cruz,* we stated that "the BIA's cursory analysis ignored the central argument in [Petitioner's] motion to reopen that he was no longer removable for committing a crime of moral turpitude."[33] In *Kang*, we disapproved when "[t]he BIA ignored overwhelming probative evidence . . . its findings were not reasonably grounded in the record and thus . . . . [t]he BIA's determination was not based on substantial evidence."[34] In *Huang*, we complained when "[t]he BIA's analysis [did] little more than cherry-pick a few pieces of evidence, state why that evidence does not support a well-founded fear of persecution and conclude that [petitioner's] asylum petition therefore lacks merit. That is selective rather than plenary review."[35] There are simply too many additional examples of such errors to feel confident in an administrative system established for the fair and just resolution of immigration disputes.[36] Most disturbing,

---

598 F.3d 103, 110 (2d Cir. 2010) ("[I]t is not clear . . . why the preventative efforts of some government actors should foreclose the possibility of government acquiescence, as a matter of law, under the CAT.").

[32] *Cruz v. Att'y Gen.*, 452 F.3d 240, 248 (3d Cir. 2006).

[33] *Id.*

[34] *Kang*, 611 F.3d at 167.

[35] *Huang v. Att'y Gen.*, 620 F.3d 372, 388 (3d Cir. 2010).

[36] *See, e.g.*, *Huang Bastardo-Vale v. Att'y Gen.*, 934 F.3d 255, 259 n.1 (3d Cir. 2019) (en banc) (castigating the BIA for its "blatant disregard of the binding regional precedent . . ."); *Mayorga v. Att'y Gen.*, 757 F.3d 126, 134-35 (3d Cir. 2014) (reversing a BIA decision without remand and observing that "[i]deally the BIA would have provided more analysis, explaining why it accepted the IJ's (erroneous) reasoning . . .") (alteration in original); *Quao Lin Dong v. Att'y Gen.*, 638 F.3d 223, 229 (3d Cir. 2011) (finding the BIA "erred by misapplying the law regarding when corroboration is necessary . . ."); *Gallimore v. Att'y Gen.*, 619 F.3d 216, 221 (3d Cir. 2010) (holding that "[t]he BIA's analysis in all likelihood rests on an historically inaccurate premise . . . . the

these failures gravely affect the rights of petitioners, such as Quinteros, who allege that they will face torture or death if removed to their country of origin.

**IV.**

Although the BIA is "[n]ot a statutory body . . ."[37] it has been described as "[t]he single most important decision-maker in the immigration system."[38] I doubt that any court or any other administrative tribunal so regularly addresses claims of life-changing significance, often involving consequences of life and death. It is therefore particularly important that the opinions of the BIA fairly and adequately resolve the legal arguments raised by the parties and render decisions based only upon the record and the law.

I understand and appreciate that the BIA's task is made more difficult by the incredible caseload foisted upon it, and the fact that BIA members (and IJs for that matter) are horrendously overworked.[39] But administrative shortcomings

---

BIA's opinion fails adequately to explain its reasoning and, in any event, appears incorrect as a matter of law."). Nor is this a concern of recent vintage, the BIA has been on notice for well over a decade. *See, e.g.*, *Kayembe v. Ashcroft*, 334 F.3d 231, 238 (3d Cir. 2003) ("[T]he BIA in this case has failed even to provide us with clues that would indicate why or how [petitioner] failed to meet his burden of proof. As a result, 'the BIA's decision provides us with no way to conduct our . . . review.'") (quoting *Abdulai v. Ashcroft*, 239 F.3d 542, 555 (3d Cir. 2001)); *Abdulai*, 239 F.3d at 555 ("[T]he availability of judicial review (which is specifically provided in the INA) necessarily contemplates *something* for us to review . . . . the BIA's failure of explanation makes [this] impossible . . .") (emphasis in original).

[37] Anna O. Law, THE IMMIGRATION BATTLE IN AMERICAN COURTS 23 (2010) (citing unpublished internal history of the BIA).

[38] Andrew I. Schoenholtz, *Refugee Protection in the United States Post September 11*, 36 COLUM. HUM. RTS. L. REV. 323, 353 (2005).

[39] *See* Am. Bar Ass'n, Comm'n on Immigration, *2019 Update Report: Reforming the Immigration System: Proposals to Promote Independence, Fairness, Efficiency, and*

can never justify denying the parties a fair and impartial hearing, or excuse allowing adjudications to devolve into a mere formality before removal.

I would like to be able to feel comfortable that the lopsided outcomes in immigration proceedings[40] reflect the merits of the claims for relief raised there rather than the proverbial "rush to judgment." Thus, on remand, I can only hope that Quinteros' claims are heard by more careful and judicious ears than he was afforded in this appearance.

---

*Professionalism in the Adjudication of Removal Cases*, Vol. 1, 20-21 (2019), available at https://www.naij-usa.org/images/uploads/newsroom/ABA_2019_reforming_the_immigration_system_volume_1.pdf (noting the continued heavy caseload of the BIA, with an increasing number of appeals likely in the near future, and a resulting tendency to dispose of cases with single-member opinions that address only a single issue in the case).

[40] Jaya Ramji-Nogales, et al., *Refugee Roulette: Disparities in Asylum Adjudication*, 60 STAN. L. REV. 295, 359-61 (2007) (reporting that between 2001 and 2005, the BIA's rate of granting asylum fell by up to 84%, with some categories of applicants receiving asylum only 5% of the time).